COURT OF APPEALS OF VIRGINIA


Present:    Chief Judge Fitzpatrick, Judges Benton, Elder, Bumgardner, Frank, Humphreys,
            Clements, Felton, Kelsey, McClanahan and Senior Judge Annunziata[*]
Argued at Richmond, Virginia


PHILLIP L. ARTIS
                                                            OPINION BY
v.      Record No. 2157-03-4                    JUDGE ROBERT J. HUMPHREYS
                                                        FEBRUARY 8, 2005
OTTENBERG'S BAKERS, INC. AND
  RELIANCE NATIONAL INDEMNITY CO.


UPON REHEARING EN BANC

FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Craig A. Brown (Ashcraft & Gerel, LLP, on brief), for appellant.

        Joseph F. Giordano (Andy M. Alexander; Semmes, Bowen &
        Semmes, P.C., on briefs), for appellees.


        Ottenberg's Bakers, Inc. ("employer") discharged appellant Phillip L. Artis for cause

after Artis staged a robbery in an attempt to murder a co-worker. Following his termination,

Artis filed a claim with the Workers' Compensation Commission, seeking temporary partial

disability benefits. The commission denied Artis' claim, reasoning that Artis had forfeited his

right to temporary disability benefits because his termination was attributable to his volitional

misconduct rather than his disability. On appeal, Artis contends that the commission erred in

denying his claim because the misconduct resulting in his termination was, in turn, caused by his

compensable psychiatric disorder. For the reasons that follow, we affirm the commission's

denial of temporary partial disability benefits.

        [*] Judge Annunziata participated in the hearing and decision of this case prior to the
effective date of her retirement on December 31, 2004 and thereafter by her designation as a
senior judge pursuant to Code § 17.1-401.

## I.  BACKGROUND

Artis was formerly employed as a route salesman for employer, a position requiring Artis to drive a bakery delivery truck in and around the Washington metropolitan area.  On October 2, 1999, Artis was driving a delivery truck along Interstate 66 in Fairfax County while en route to one of employer's customers.  At approximately 3:45 a.m., Artis came upon an apparent "road rage" incident on the interstate.  Several people involved in the incident got out of their vehicles and ran across the highway in front of Artis' truck.  The last person attempting to cross the highway darted directly in the path of the truck.  Although Artis tried to avoid hitting that individual, he was unable to do so, striking and killing the pedestrian.

Artis, who was in a "daze" and hyperventilating after the accident, called employer to report the incident.  Artis told his manager that he was too distraught to finish the shift, but the manager informed him that Artis had to complete the delivery route because employer did not have any other employees who could replace him.  Artis finished his route, completed his paperwork, and drove himself home.

Two days later, Artis went to the Providence Hospital Wellness Institute, seeking medical treatment for back pain.  He was diagnosed with thoracic strain and excused from work through October 10, 1999.  On October 11, Artis returned to the Wellness Institute for a follow-up evaluation.  Artis reported that he was unable to drive and was suffering from emotional distress because of the accident.

On October 12, 1999, Dr. Cecil Harris, a clinical psychologist, evaluated Artis' mental condition.  Artis told Dr. Harris that, after the accident, he began to experience flashbacks, fearing "that it would happen again" and that he would be "thought of as a killer."  Those feelings caused Artis to experience "depression to the point . . . [he] was suicidal."  Artis had also developed a fear of driving and crossing the street, occasionally suffered from anxiety

attacks, had trouble sleeping and getting out of bed, and had experienced problems maintaining an erection. Artis additionally told Dr. Harris that, three years earlier, he had received psychological treatment for "rage."

Dr. Harris found that Artis' initial mental examination "revealed a nervous, tense/anxious, depressed, agitated, phobic male who was fully oriented with sad, hopeless, and depressed affect, and depressed/irritable mood," and who "denied suicidal and homicidal ideation and was having trouble containing paranoid, hostile, and violent urges secondary to his anxious, agitated feelings." Dr. Harris diagnosed Artis as suffering from post-traumatic stress disorder ("PTSD") and "Adjustment Disorder with Mixed Anxiety and Depressed Mood," and he initiated a "treatment plan of twice weekly, or as needed psychotherapy." As part of his treatment, Artis also took Zyprexa, an anti-depressant. Dr. Harris additionally recommended that, when Artis returned to work, he should initially ride with another driver, then have another driver with him, and, ultimately, drive by himself "when ready."

Thus, when Artis returned to work on October 25, 1999, he assumed a selective duty capacity. He began riding along with other drivers, and he later began to drive by himself, sometimes accompanied by a co-driver. By at least January of 2000, Artis "was returned to full duty with the stipulation if [he] need[ed] help, [he could] ask the night manager and [help] would be provided." According to Artis, the night manager "refused on a few occasions" to provide him with the requested help.

Artis continued to undergo "generally weekly and sometimes bi-weekly" counseling sessions with Dr. Harris through July 2000. During these sessions, Artis reported continuing feelings of rage and depression. Artis still experienced occasional flashbacks, and he was having trouble sleeping. Artis also believed that employer was not supportive of his recovery efforts,

and he felt that employer was deliberately trying to get him to leave the company by, for example, denying him a ride-along helper.

After a few months of counseling with Dr. Harris, Artis' psychological condition seemed to be improving.  However, on May 4, 2000, employer re-assigned Artis to the route he was driving in October 1999 when he struck and killed the pedestrian.  At that point, Artis' psychological condition began to deteriorate, causing him to experience suicidal and homicidal tendencies.

In response to Artis' re-assignment to his former route, Dr. Harris wrote a letter to William Walker, employer's human resources manager.  Dr. Harris informed Walker that Artis was "greatly stressed and somewhat regressed," presumably because he had been "scheduled to service the route where his accident occurred on October 2, 1999."  Dr. Harris further indicated that, although Artis "has made much progress in his therapy and his rehabilitation is progressing well," Artis "is clinically not ready to service that particular route at this time."  Dr. Harris concluded that "[i]t is important that we continue to work closely together towards supporting [Artis'] full recovery."  Employer, however, did not re-assign Artis to a different route.

By the beginning of June 2000, Artis was still experiencing homicidal and suicidal tendencies, but he informed Dr. Harris that he was "coping [with the] new route," and had developed sufficient "confidence to move forward now [without] a rider."  On June 14, however, Artis told Dr. Harris that, although he had recently been given a ride-along helper, the dispatcher had informed Artis that "there would be no new approval for a new rider."  Dr. Harris told Artis that he would write or call employer regarding Artis' "need for a rider from time to time."  Artis later testified that, at that point, he blamed Walker for denying him a "ride along helper," and he believed Walker was "operating to get [him] out of the company."

On June 29, 2000, Artis "faked" a robbery of the delivery truck he was driving, and he filed a false police report indicating that he had been robbed of "[b]etween two and three hundred" dollars. Artis staged the robbery because he expected Walker to respond to the scene of the reported robbery, at which time he intended to kill Walker. Artis later testified that his intent was "to do the same harm [to Walker that Walker] was doing to my family." He wanted to "get even" because he felt that Walker failed to adequately respond to Artis' difficulties in performing his job. Artis also testified that he staged the robbery attempt because "the bills were mounting" and he was having difficulty with child support.

About an hour after the staged robbery, Artis was arrested, and he pled guilty to the charge of filing a false police report. After his arrest, employer fired Artis because of his misconduct.

On October 2, 2001, Artis filed a claim for benefits arising out of the accident of October 2, 1999. Artis alleged that he "injured his back and suffered psychological injuries, including post-traumatic stress disorder as a direct result" of the compensable accident. Artis sought medical benefits, an award of temporary total disability from October 2, 1999 through December 17, 1999, and temporary partial disability compensation for various periods following the termination of his employment.

At the hearing before the deputy commissioner, employer stipulated that, in October 1999, Artis experienced a compensable accident arising out of and in the course of his employment. Employer also acknowledged that there was some injury to claimant's back and some psychological injury resulting from that accident. Employer further agreed that some compensation was voluntarily paid and that "psychiatric treatment [was] authorized and paid for at least up until a certain point." Employer defended the claim on the grounds that Artis was not disabled in the nature or to the extent alleged, that there was no causal relationship between the

injury and the subsequent periods of disability, and that Artis was not entitled to any partial disability benefits after he was terminated for cause.

Artis contended, however, that he was entitled to post-termination temporary partial disability benefits because the misconduct that led to his termination was caused by his compensable disability. As proof of causation, Artis introduced a letter, dated July 18, 2000, that Dr. Harris had sent to Artis' union president. In this letter, Dr. Harris summarized Artis' diagnosis and treatment for PTSD, concluding that, "Artis discussed in detail the incident of 06/29/00 in therapy. It is my opinion, based on the information I have, that Artis' involvement in this incident is related to his diagnosis."

Artis also introduced Dr. Harris' response to a letter from Artis' counsel, dated September 24, 2002. In this questionnaire, when asked to explain the basis for his conclusion that the "feigned robbery resulted directly from [claimant's] accident-related psychiatric condition," Harris responded:

> I still hold the opinion that the feigned robbery of 06/29/00 resulted directly from [] Artis'[] accident-related psychiatric condition. Mr. Artis was still actively traumatized by his 10/02/99 fatality, on 06/29/00. He was also frustrated, angry, fearful and problem-solving very poorly at that time. He was sleep deprived [with] suicidal ideation as well. In his mind this was not an act of robbery, but one of symbolically regaining his loss of control.

The deputy commissioner found that Artis "experienced a compensable injury by accident on October 2, 1999, as alleged, resulting primarily in a post-traumatic stress disorder." The deputy commissioner also determined that "claimant carried his burden of proving entitlement to temporary [total] disability compensation from October 4, 1999, through October 10, 1999." The deputy commission further held, however,

> that the employer's termination of the claimant on June 29, 2000, based upon his fabrication of a robbery and the filing of a false police report, was for justified cause sufficient to permanently bar the claimant's entitlement to partial wage loss compensation

thereafter. . . . We further conclude that the claimant's wage loss after June 29, 2000, *is properly attributable to his own conduct*, and not to any disability resulting from the October 2, 1999 injury by accident. We reach this conclusion notwithstanding Dr. Harris' opinion that on June 29, 2000, the claimant remained "actively traumatized" by the events of October 2, 1999, and that his action in feigning the robbery attempt was "one of symbolically regaining his loss of control." To the extent the claimant then felt pressured by the employer to resume his normal work activities, a conclusion we doubt based upon our assessment of the claimant's credibility, the claimant had various other options available to him other than feigning a robbery so that he might attempt a murder.

(Emphasis added.)

Artis appealed the deputy commissioner's decision to the full commission. The commission affirmed, finding:

The evidence in this case establishes that the claimant was under some restrictions at the time of his discharge. He was discharged after he feigned a robbery with the intent to harm an individual employed by the employer. Dr. Harris implicated a variety of factors which led to this behavior, including the claimant's frustration and anger. A close review of Dr. Harris'[] contemporaneous treatment notes, as well as the claimant's testimony, demonstrates that the claimant's main problems were not directly related to his accident. The claimant's problems involved anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma. These problems are of a nature more akin to stress resulting from an employee's interaction with his supervisors, which is not compensable. See Teasley v. Montgomery Ward & Co., 14 Va. App. 45, 415 S.E.2d 596 (1992). We also note that the documentary [evidence] reveals pre-existing problems with anger or "rage," despite the claimant's denials to the contrary.

We find that the totality of the evidence shows that the claimant was responsible for his wrongful actions on June 29, 2000. Under the circumstances presented, we agree that the claimant was discharged for justified cause, supporting the forfeiture of benefits.

Artis appealed this decision to this Court. By opinion dated June 1, 2004, a panel of this Court, with one judge dissenting, reversed the commission, concluding that "there is no credible

evidence in the record to support the commission's finding that claimant was discharged from selective employment for reasons unrelated to his compensable work-related accident." Artis v. Ottenberg's Bakers, Inc., 43 Va. App. 137, 157, 596 S.E.2d 547, 557 (2004). Accordingly, the panel remanded this case to the commission "for the purpose of calculating the amount of claimant's post-termination workers' compensation benefits." Id. at 164, 596 S.E.2d at 560-61.

We granted employer's petition for rehearing *en banc*, stayed the mandate of the panel decision, and reinstated the appeal. Upon rehearing *en banc*, we affirm the commission's denial of benefits.

## II. ANALYSIS

The sole issue on appeal is whether the commission erred in concluding that Artis' misconduct justified a forfeiture of his disability benefits. Artis argues that his misconduct did not justify forfeiture because it was caused by his compensable disability. We, however, agree with employer that there is credible evidence in the record supporting the commission's determination that Artis' termination was attributable to his wrongful, volitional conduct rather than his disability.

On appeal from a decision of the Workers' Compensation Commission, the evidence and all reasonable inferences that may be drawn from that evidence are viewed in the light most favorable to the party prevailing below. Clinchfield Coal Co. v. Reed, 40 Va. App. 69, 72, 577 S.E.2d 538, 539 (2003); Tomes v. James City (County of) Fire, 39 Va. App. 424, 429, 573 S.E.2d 312, 315 (2002). Also, "[w]e do not judge the credibility of witnesses or weigh the evidence on appeal." Celanese Fibers Co. v. Johnson, 229 Va. 117, 121, 326 S.E.2d 687, 690 (1985). Rather, we are bound by the commission's findings of fact as long as "there was credible evidence presented such that a reasonable mind *could* conclude that the fact in issue was proved," Westmoreland Coal Co. v. Campbell, 7 Va. App. 217, 222, 372 S.E.2d 411, 415 (1988)

(emphasis in original), even if there is evidence in the record that would support a contrary finding. Morris v. Badger Powhatan/Figgie Int'l, Inc., 3 Va. App. 276, 279, 348 S.E.2d 876, 877 (1986); Russell Loungewear v. Gray, 2 Va. App. 90, 95, 341 S.E.2d 824, 826 (1986).

It is well settled that, "where a disabled employee is terminated for cause from selective employment procured or offered by his employer, any subsequent wage loss is properly attributable to his wrongful act rather than his disability." Chesapeake & Potomac Telephone Co. v. Murphy, 12 Va. App. 633, 639-40, 406 S.E.2d 190, 193, aff'd en banc, 13 Va. App. 304, 411 S.E.2d 444 (1991). Thus, an employee "who is terminated for cause and for reasons not concerning his disability is not entitled to receive compensation benefits." Id. at 637, 406 S.E.2d at 192 (discussing Goodyear Tire & Rubber Co. v. Watson, 219 Va. 830, 252 S.E.2d 310 (1979)); see also Potomac Edison Co. v. Cash, 18 Va. App. 629, 631, 446 S.E.2d 155, 157 (1994) ("Under the Act, an employee who is properly terminated from selective employment procured by the employer for cause consisting of willful misconduct forfeits his or her entitlement to future temporary partial disability benefits.").

As we have noted,

> "A justified discharge . . . does not simply mean that the employer can identify or assign a reason attributable to the employee as the cause for his or her being discharged. Whether the reason[] for the discharge is for cause, or is justified for purposes of forfeiting benefits must be determined in the context of the purpose of the Act and *whether the conduct is of such a nature that it warrants permanent forfeiture of those rights and benefits*."

Walter Reed Convalescent Ctr. v. Reese, 24 Va. App. 328, 336, 482 S.E.2d 92, 96-97 (1997) (quoting Eppling v. Schultz Dining Programs, 18 Va. App. 125, 128, 442 S.E.2d 219, 221 (1994)) (alteration and omission in original) (internal quotations omitted) (emphasis added).

Also, it is not necessary to prove "that the employee's wrongful act was intentional, willful, or deliberate in order to justify a termination for cause and a forfeiture of compensation

benefits." Reese, 24 Va. App. at 336-37, 482 S.E.2d at 97. Rather, all that is required is a showing: (1) that the wage loss is "properly attributable" to the wrongful act; and (2) that the employee is "responsible" for that wrongful act. Id. at 336, 482 S.E.2d at 97 ("'In order to work a forfeiture, the wage loss [must be] properly attributable to [the employee's] wrongful act . . . for which the employee is responsible.'" (quoting Eppling, 18 Va. App. at 129, 442 S.E.2d at 222 (alterations and omission in original) (internal quotations omitted))).

A. Whether Artis' Termination Was "Attributable" to His Misconduct

In determining whether a claimant's termination was "attributable" to the claimant's wrongful act, the overriding inquiry is as follows: Was the claimant fired because of his disability, or was he fired because of his misconduct?[1] In making this determination, the commission should "consider the nature of [the] conduct" alleged to justify the dismissal. Eppling, 18 Va. App. at 129, 442 S.E.2d at 221. Ultimately, the burden of proof is on the claimant to demonstrate that his termination was attributable to his disability rather than his wrongful act. See Washington Metro. Area Transit Auth. v. Harrison, 228 Va. 598, 600-02, 324

---

[1] In construing Murphy and Watson, we note that we have used inconsistent and potentially confusing language when discussing this aspect of the forfeiture rule. For example, we have questioned whether the claimant's dismissal was "concerning," Richfood Inc. v. Williams, 20 Va. App. 404, 408, 457 S.E.2d 417, 419 (1995); Timbrook v. O'Sullivan Corp., 17 Va. App. 594, 597, 439 S.E.2d 873, 875 (1994), "related to," Williams, 20 Va. App. at 409, 457 S.E.2d at 419; Timbrook, 17 Va. App. at 595, 439 S.E.2d at 874, "caused by," Reese, 24 Va. App. at 338, 482 S.E.2d at 97; Eppling, 18 Va. App. at 130, 442 S.E.2d at 222, "as a result of," Watson, 219 Va. at 833, 252 S.E.2d at 313, "attributable to," Eppling, 18 Va. App. at 129, 442 S.E.2d at 222, "as a consequence of," Williams, 20 Va. App. at 406, 457 S.E.2d at 418; Eppling, 18 Va. App. at 130, 442 S.E.2d at 222, "due to," Williams, 20 Va. App. at 405, 457 S.E.2d at 417; Eppling, 18 Va. App. at 129, 442 S.E.2d at 222, or "causally related to," Reese, 24 Va. App. at 330, 482 S.E.2d at 93, his compensable disability. Each of these phrases has a slightly different import. But regardless of which language is employed, the underlying focus is the same: Was the claimant fired because of his disability, or was he fired for another reason entirely? See, e.g., Marval Poultry Co. v. Johnson, 224 Va. 597, 601, 299 S.E.2d 343, 345 (1983) (holding that claimant was not entitled to post-termination disability benefits where "there is nothing in the record from which it may reasonably be inferred that [the claimant] was dismissed *because of* his [disability]" rather than his dishonesty (emphasis added)).

- 10 -

S.E.2d 654, 655-56 (1985) (holding that claimant who had no previous disability award entered in his favor had the burden to prove that he was entitled to temporary total disability benefits following termination of employment).

Here, then, we must consider whether Artis was fired because of his disability (*e.g.*, because his disability prevented him from adequately performing his duties), or whether he was fired for another reason entirely. The commission found that Artis failed to carry his burden of proving that his termination was attributable to his disability, concluding that Artis was discharged not because of his disability, but because he became angry with employer and, as a result, "feigned a robbery with the intent to harm an individual employed by the employer." There is credible evidence in the record supporting this conclusion.

Specifically, the record indicates that Artis had been performing his full duties and receiving full wages for at least six months preceding the staged robbery. Also, Artis was not fired because, for example, his disability rendered him unable to drive certain routes or perform the physical duties required by his job. See, e.g., Watson, 219 Va. at 833, 252 S.E.2d at 312-13 (holding that, where the claimant failed to "make any claim that [his] job . . . was too difficult for him to perform because of his [] injury . . . it cannot be inferred from any evidence in the record that [he] was discharged as a result of his [] injury"). As noted by the deputy commissioner, employer "had modified [Artis'] activities as of his return to work to accommodate the continuing effects of his diagnosed post-traumatic stress disorder," and Artis "was at least some times provided an assistant and permitted to avoid driving his normal pre-injury route." Rather than being fired because he demanded an assistant or did not wish to drive his "normal" route, it is uncontradicted that Artis was fired because he staged a robbery, misappropriating between $200 and $300 of the employer's funds, with the intent of murdering his supervisor once he arrived at the scene.

Additionally, the "nature of [the] conduct" resulting in Artis' dismissal, Eppling, 18 Va. App. at 129, 442 S.E.2d at 221, certainly justifies a forfeiture of temporary partial disability benefits. Artis himself testified that he acted with premeditation, and with knowledge of his actions and the consequences of those actions. Attempted homicide constitutes precisely the type of "wrongful act" that should "justif[y]" a forfeiture of compensation benefits. Murphy, 12 Va. App. at 639, 406 S.E.2d at 193; cf. Watson, 219 Va. at 833, 252 S.E.2d at 313 (holding that a partially disabled employee's benefits were properly terminated when the employee was discharged because he had been "an exceedingly poor worker during the entire period of his employment . . . he had a great number of absences from work, and . . . several times he left his job without authorization"); Marval Poultry Co. v. Johnson, 224 Va. 597, 598, 299 S.E.2d 343, 344 (1983) (holding that a disabled employee on selective work status was no longer entitled to workers' compensation benefits when "he [was] discharged by his employer for dishonesty"); Murphy, 12 Va. App. at 639, 406 S.E.2d at 193 (holding that an employee's conduct constituted "cause" for discharge, justifying a forfeiture of benefits, where he was guilty of fraudulent misrepresentations in his attempt to obtain compensation benefits); Richfood, Inc. v. Williams, 20 Va. App. 404, 410, 457 S.E.2d 417, 420 (1995) ("Where passing drug and alcohol screening is made a clear and unequivocal condition of employment, . . . failure to pass the screening is tantamount to misconduct . . . for which an employee can be terminated.").

Artis contends, however, that the commission erred in determining that his termination was not attributable to his disability because his disability caused the misconduct that, in turn, caused his termination. Initially, we note that the critical inquiry here is not whether there is a causal relationship between the disability and the claimant's *misconduct*. Rather, we are concerned with the relationship between the disability and the claimant's *termination*.

Regardless, we decline Artis' implicit offer to recognize a rule that would permit a claimant to show that he is entitled to post-termination benefits because, in an "unbroken chain of events," his disability was a contributing cause of the misconduct resulting in his termination. Because such a rule would inevitably lead to absurd results, we hold instead that there must be an immediate, proximate nexus between the disability and the termination for the termination to be deemed "attributable to" the disability.[2]

As the commission correctly found, that immediate nexus is lacking here: Artis was discharged because he staged a robbery, not because he was disabled. Thus, there is not, as Artis contends, an "unbroken chain of events" between Artis' compensable disability and his termination. Rather, Artis' own willful, volitional misconduct constitutes an intervening cause sufficient to break that chain of causation.

Moreover, the commission expressly rejected Artis' contention that his psychiatric condition directly caused his misconduct, finding instead that Artis' misconduct was caused by "anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma." This conclusion is supported by credible evidence in the record. Specifically, the record indicates that, despite having been paid full wages for at least six months, Artis' "bills were mounting," and he was having difficulty paying for child support. Also, Artis had experienced previous problems with "rage," and he was becoming increasingly angry with his employer for re-assigning him to a route that he (understandably) did not wish to drive.

---

[2] So, for example, if a claimant hurts his back, and – because of the pain – becomes an alcoholic, and is later fired because he appears for work in an inebriated state, he cannot then claim that his termination was "attributable to" his disability even though there is an attenuated chain of causation between the disability and the misconduct that caused his termination. In contrast, if that same claimant hurts his back, and is fired because he is no longer able to perform his duties, this more immediate nexus would suffice to show that his termination was "attributable to" his disability.

Thus, credible evidence in the record supports the commission's conclusion that Artis'

misconduct was caused by stress "resulting from [his] interaction with his supervisors," not his

psychiatric condition or its residual effects.[3]

We also reject Artis' argument that our decision in Food Distributors v. Estate of Ball, 24

Va. App. 692, 485 S.E.2d 155 (1997), compels a different result. In Estate of Ball, the decedent

suffered a job-related, compensable injury. Id. at 695, 485 S.E.2d at 157. Following the injury,

the decedent was "unable to work full time or to engage in simple, repetitive tasks." Id. As a

result, he fell into a depression and ultimately committed suicide. Id. at 695-96, 485 S.E.2d at

157. The decedent's widow filed a claim for benefits, contending that the decedent's suicide was

caused by his earlier, job-related injury. Id. at 696, 485 S.E.2d at 157. The employer, however,

citing to Code § 65.2-306(A)(1),[4] argued that "the commission erred in awarding benefits to

claimant because decedent's suicide was an independent and willful act that barred

compensation." Id. at 697, 485 S.E.2d at 158. We affirmed the commission's award of benefits,

holding that the record contained credible evidence indicating that the suicide was causally

related to the earlier injury. Id. at 703-06, 485 S.E.2d at 161-62.

Estate of Ball is, however, inapposite to this case for three reasons. First and foremost,

Estate of Ball concerned the doctrine of compensable consequences rather than the termination

---

[3] We also note that this is not a case where the commission was required to accept the "uncontradicted medical evidence" of one of the parties. Artis' only evidence that his misconduct was directly related to his disability was the opinion of his psychologist. Because a licensed psychologist is not a medical doctor, a psychologist's opinion is not actually "medical" evidence. Cf. John v. Im, 263 Va. 315, 321, 559 S.E.2d 694, 697 (2002) (noting that an expert witness "was a licensed psychologist, not a medical doctor"). Said differently, although a psychologist may certainly be qualified to render an *expert* opinion, an expert opinion is not necessarily equivalent to a *medical* opinion.

[4] Code § 65.2-306(A) provides that "[n]o compensation shall be awarded to the employee or his dependents for an injury or death caused by (1) The employee's willful misconduct or intentional self-inflicted injury . . . ."

for cause doctrine. The doctrine of compensable consequences, also known as the chain of causation rule, is applicable when a claimant asserts that a subsequent injury should be compensable because it was "caused by" an earlier, compensable injury. See, e.g., Leadbetter, Inc. v. Penkalski, 21 Va. App. 427, 432, 464 S.E.2d 554, 556 (1995) ("[W]here . . . the chain of causation from the original industrial injury to the condition for which compensation is sought is direct, and not interrupted by any intervening cause attributable to the [employee's] own intentional conduct, then the subsequent [condition] should be compensable." (internal quotations omitted)). The doctrine of compensable consequences, therefore, deals not with the causal relationship between a termination and an injury, but rather, the causal relationship between an earlier injury and a subsequent injury. In contrast, the termination for cause doctrine applies when the claimant asserts that he was terminated because of his earlier, compensable injury. These are, therefore, entirely separate inquiries: One focuses on whether the claimant's *termination* was "attributable to" a prior compensable injury, and the other focuses on whether the claimant's *injury* was "caused by" a prior compensable injury. Thus, the two doctrines cannot be intermingled – they deal with entirely separate circumstances and entirely separate rules of law.

Second, Estate of Ball involved the reconciliation of the statutory language "willful misconduct or intentional self-inflicted injury" contained in Code § 65.2-306(A)(1) with cases involving suicide. There is no issue of statutory construction – or suicide – involved in this case. And third, Estate of Ball *affirmed* the commission's award of benefits, finding that credible evidence supported the commission's determination that the decedent's death was causally related to his injury. Here, in contrast, the commission *denied* Artis' claim of benefits, so we must affirm the commission's decision as long as there is credible evidence in the record

- 15 -

supporting the commission's finding that Artis' termination was not attributable to his compensable injury.

In sum, there is ample evidence in the record supporting the commission's conclusion that Artis was fired because of his misconduct, not because of his disability. Thus, we affirm the commission's conclusion that Artis' termination was not attributable to his disability.

### B. Whether Artis Was "Responsible" for His Misconduct

In determining whether the claimant was "responsible" for his wrongful act, the crucial determination is whether the claimant's misconduct was voluntary or involuntary. A disabled employee who engages in voluntary misconduct is deemed to have constructively refused an offer of selective employment, thereby justifying a forfeiture of benefits. See, e.g., Porter v. Ford Motor Co., 311 N.W.2d 458, 460 (Mich. Ct. App. 1981) ("A disabled employee who can perform that favored work, yet violates company rules to the extent that discharge is justified, in actuality is refusing to perform the favored work[,] [] thus creating a bar to compensation . . . ."); see also Richmond Cold Storage Co. v. Burton, 1 Va. App. 106, 111, 335 S.E.2d 847, 850 (1985) (noting that "an employee is guilty of 'misconduct connected with his work' when he *deliberately* violates a company rule" (emphasis in original)). In contrast, conduct that is involuntary does not justify a forfeiture of benefits because it is, by its very nature, beyond the employee's control and, therefore, not equivalent to a constructive refusal of selective employment. See, e.g., Reese, 24 Va. App. at 338, 482 S.E.2d at 98 (noting that, in Eppling, "we held that the claimant's excessive absenteeism caused by a non-work-related injury *beyond the employee's control* was not the type of wrongful act which, upon termination, justified a forfeiture of workers' compensation benefits" (emphasis added)).

Under the circumstances of this case, there is credible evidence in the record supporting the commission's decision that Artis "was responsible for his wrongful actions on June 29,

- 16 -

2000." Although Dr. Harris opined that Artis' conduct was caused by his PTSD, there is no evidence that this "causal relationship" affected Artis to such an extent that his actions were "beyond [his] control." Reese, 24 Va. App. at 338-39, 482 S.E.2d at 97-98. Although Artis did offer proof that his accident resulted in a compensable psychiatric disorder, the evidence did not indicate that his mental state had deteriorated to the point that he was no longer able to control his actions. In fact, Artis himself testified that he acted with premeditation, and with knowledge of his actions and the consequences of those actions. Thus, credible evidence in the record supports the commission's determination that Artis was responsible for his voluntary misconduct.

Artis contends that our decision in Timbrook v. O'Sullivan Corp., 17 Va. App. 594, 439 S.E.2d 873 (1994), mandates a different result. In Timbrook,

> [we] held that the Murphy forfeiture rule does not apply to an employee who was discharged for failing to notify her employer that she would be absent from selective employment *that she had refused*. Because the employee had refused, or not accepted, the employer's offer of selective employment, her termination following three consecutive absences was "not for cause or for misconduct, as in Murphy, [which would] justify a forfeiture of her compensation benefits that could never be cured." [Timbrook, 17 Va. App. at 598, 439 S.E.2d at 876].

Eppling, 18 Va. App. at 129-30, 442 S.E.2d at 222 (discussing Timbrook, 17 Va. App. at 598, 439 S.E.2d at 876) (emphasis added). Unlike the claimant in Timbrook, Artis *accepted* employer's offer of selective employment. Thus, Timbrook is inapplicable here.

As noted by the deputy commissioner, "[t]o the extent [Artis] then felt pressured by the employer to resume his normal work activities, . . . [he] had various other options available to him other than feigning a robbery so that he might attempt a murder." Thus, because Artis' misconduct was purely voluntary in nature, the commission did not err in determining that Artis' termination for cause justified a forfeiture of benefits.

## III. CONCLUSION

Accordingly, the commission correctly determined that Artis was terminated, not for reasons attributable to his injury or its residual effects, but for misconduct for which he was fully "responsible." Although we certainly do not condone the insensitive manner in which employer apparently treated Artis following his industrial accident, the reprehensibility of employer's conduct is not at issue here. Rather, we are constrained to deciding the issue of whether credible evidence supports the commission's determination that Artis' termination was attributable to his volitional misconduct rather than his disability. Here, because the record supports the commission's determination that employer did not terminate Artis because of his injury or its "residual effects," but rather, because of his voluntary, criminal acts, we affirm the commission's denial of post-termination partial disability benefits.

Affirmed.

Clements, J., with whom Fitzpatrick, C.J., Benton, Elder and Annunziata, JJ., join, dissenting.

For the reasons that follow, I would hold that the commission erred in denying Artis's claim for temporary partial disability benefits following his termination from selective employment provided by employer. Hence, I respectfully dissent from the majority's analysis and conclusion.

The sole issue before the commission was whether Artis was entitled to partial disability compensation following his termination from selective employment. Concluding, as the majority notes, "that Artis failed to carry his burden of proving that his termination was attributable to his disability," the commission found as follows:

> The evidence in this case establishes that the claimant was under some restrictions at the time of his discharge. He was discharged after he feigned a robbery with the intent to harm an individual employed by the employer. Dr. Harris implicated a variety of factors which led to this behavior, including the claimant's frustration and anger. A close review of Dr. Harris's contemporaneous treatment notes, as well as the claimant's testimony, demonstrates that the claimant's main problems were not directly related to his accident. The claimant's problems involved anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma. These problems are of a nature more akin to stress resulting from an employee's interaction with his supervisors, which is not compensable. See Teasley v. Montgomery Ward & Co., 14 Va. App. 45, 415 S.E.2d 596 (1992). We also note that the documentary [evidence] reveals pre-existing problems with anger or "rage," despite the claimant's denials to the contrary.

> We find that the totality of the evidence shows that the claimant was responsible for his wrongful actions on June 29, 2000. Under the circumstances presented, we agree that the claimant was discharged for justified cause, supporting the forfeiture of benefits.

On appeal, Artis does not challenge employer's right to terminate him for feigning the robbery. He argues, however, that his termination from selective employment did not justify a

forfeiture of subsequent disability benefits because the evidence in the record supports no other conclusion than that his feigning the robbery was directly attributable to the post-traumatic stress disorder he suffered as a result of the October 2, 1999 compensable industrial accident. Thus, he contends the commission erred, as a matter of law, in finding that his post-termination wage loss was not causally related to his compensable psychiatric disability and in ruling, based on that finding, that his discharge "for justified cause" precluded him from receiving the requested post-termination wage-loss benefits.

Employer concedes on appeal, as it did below, that, as a result of his industrial accident on October 2, 1999, Artis suffered a compensable psychiatric injury that was diagnosed as post-traumatic stress disorder. Employer maintains, however, that, because credible evidence supports the commission's finding that Artis's feigning the robbery was attributable to his "pre-existing problems with anger" and "the stress that resulted from his interaction with employer, [and] not his work-related accident," this Court is bound by that finding. Because it is unrelated to the compensable accident, such stress, employer argues, in reliance on Teasley, 14 Va. App. 45, 415 S.E.2d 596, provides no basis for post-termination disability benefits. Consequently, employer concludes, the commission correctly determined that Artis's willful misconduct justified the forfeiture of compensation benefits.

The determination whether the commission erred in concluding that Artis's feigning the robbery "justified a forfeiture of his disability benefits" requires consideration of two inquiries: First, whether an injured employee's termination for cause from selective employment provided by the employer automatically bars the employee from receiving post-termination wage-loss benefits and, second, whether sufficient evidence exists to support the findings of the commission.

I.

In affirming the commission's decision, the majority, quoting Walter Reed Convalescent Ctr. v. Reese, 24 Va. App. 328, 336-37, 482 S.E.2d 92, 97 (1997), holds that, when an employer discharges a partially disabled employee from selective employment for misconduct, "all that is required" to "'justify . . . a forfeiture of [post-termination] compensation benefits'" is a "showing: (1) that the [fired employee's] wage loss is 'properly attributable' to the [employee's] wrongful act; and (2) that the employee is 'responsible' for that wrongful act." I believe that, in reaching this conclusion, the majority misconstrues the applicable case law, which, in my view, also requires that the fired employee's wrongful act is not properly attributable to his or her work-related injury.

The so-called "termination for cause" doctrine had its genesis in Goodyear Tire & Rubber Co. v. Watson, 219 Va. 830, 252 S.E.2d 310 (1979), and Marval Poultry Co. v. Johnson, 224 Va. 597, 299 S.E.2d 343 (1983). In Watson, the claimant was fired by the employer because of his unsatisfactory selective work habits and performance. 219 Va. at 832, 252 S.E.2d at 312. The commission decided that the claimant was entitled to a resumption of benefits following his termination because, *inter alia*, his poor selective work performance "'could well [have been] attributable'" to his work-related injury. 219 Va. at 833, 252 S.E.2d at 312. Finding no support for the commission's decision in the record, the Supreme Court of Virginia reversed the award, stressing that, "[w]hen [the claimant's] actions and conduct in connection with his selected work . . . [were] considered, it [could not] be inferred from any evidence in the record that [he] was discharged *as a result of his . . . injury*." Id. at 833, 252 S.E.2d at 312-13 (emphasis added).

In Johnson, the claimant was discharged from selective employment for dishonesty. 224 Va. at 599, 299 S.E.2d at 344. The Supreme Court reversed the commission's decision awarding post-termination benefits, stating that "there [was] nothing in the record from which it [could]

- 21 -

reasonably be inferred that [the claimant] was dismissed *because of his [accident-related]*

*tendonitis*." Id. at 601, 299 S.E.2d at 345 (emphasis added).

Examining Watson and Johnson, among other cases, this Court held in C & P Telephone

Co. v. Murphy, 12 Va. App. 633, 639-40, 406 S.E.2d 190, 193, aff'd en banc, 13 Va. App. 304,

411 S.E.2d 444 (1991), that, under former Code § 65.1-63 (now Code § 65.2-510),

> where a disabled employee is terminated for cause from selective
> employment procured or offered by his employer, any subsequent
> wage loss is properly attributable to his wrongful act rather than
> his disability. The employee is responsible for that loss and not the
> employer. In this context, we are unable to find any provision
> within the Workers' Compensation Act which evidences an intent
> by the legislature to place such an employee in a better position
> than an uninjured employee who is terminated for cause and by his
> wrongful act suffers a loss of income.

However, the forfeiture rule set forth in Murphy has subsequently been "limited to its

factual context," Tumlin v. Goodyear Tire & Rubber Co., 18 Va. App. 375, 380, 444 S.E.2d 22,

24 (1994), and found not to bar a claimant discharged from selective employment for willful

misconduct from receiving post-termination wage-loss benefits when the wage loss is "properly

attributable" to the claimant's "disability caused by a compensable industrial accident," Potomac

Edison Co. v. Cash, 18 Va. App. 629, 633-34, 446 S.E.2d 155, 157-58 (1994). As this Court

noted in Cash, "[t]he underlying premise of the rule in Murphy is to hold employees responsible

*only* for any wage loss properly attributable to their wrongful conduct[;] . . . decisions of this

Court rendered after Murphy establish that termination for cause is not the sole issue in

determining eligibility for benefits under the Act." Id. at 633, 446 S.E.2d at 157 (emphasis

added).

Indeed, citing Watson and Johnson, this Court explained in Timbrook v. O'Sullivan

Corp., 17 Va. App. 594, 597, 439 S.E.2d 873, 875 (1994) (emphases added) (citations omitted),

that

an employee on selective employment offered or procured by the employer, who is discharged for cause *and for reasons not concerning the disability*, forfeits his or her right to compensation benefits like any other employee who loses employment benefits when discharged for cause. The reason for the rule is that the wage loss is attributable to the employee's wrongful act *rather than the disability*.

Thus, a discharge from selective employment does not "create a forfeiture of workers' compensation benefits" if "the reason for the discharge . . . concern[s]" the employee's disability. Id. at 598-99, 439 S.E.2d at 876.

In Eppling v. Schultz Dining Programs, 18 Va. App. 125, 130, 442 S.E.2d 219, 222 (1994), this Court held that, even if the termination is based on a wrongful act by the employee, not every "type of willful conduct or misbehavior [arises to the level] that, upon termination, justifies a forfeiture of workers' compensation benefits [under Murphy]." As this Court explained:

> When a disabled employee is discharged from selective employment, the "inquiry focuses on whether the claimant's benefits may continue in light of [the] dismissal." Richmond Cold Storage Co. v. Burton, 1 Va. App. 106, 111, 335 S.E.2d 847, 850 (1985). An employee's workers' compensation benefits will be permanently forfeited only when the employee's dismissal is "justified," the same as any other employee who forfeits . . . benefits when discharged for a "justified" reason. Id.
>
> A "justified" discharge (one which warrants forever barring reinstatement of workers' compensation benefits) does not simply mean that the employer can identify or assign a reason attributable to the employee as the cause for his or her being discharged. Whether the reason for the discharge is for "cause," see Murphy, 12 Va. App. at 639, 406 S.E.2d at 193, or is "justified" for purposes of forfeiting benefits must be determined in the context of the purpose of the Act and whether the conduct is of such a nature that it warrants a permanent forfeiture of those rights and benefits. "The [c]ommission . . . must be mindful of the purposes and goals of the" Act. Burton, 1 Va. App. at 111, 335 S.E.2d at 850.

Id. at 128, 442 S.E.2d at 221.

"The fundamental purpose of the Workers' Compensation Act . . . [is] compensation for accidental injuries within the hazards of the employment." Morris v. Morris, 238 Va. 578, 584, 385 S.E.2d 858, 861 (1989). Accordingly, the Act is intended

> to provide compensation to an employee for the loss of his opportunity to engage in work, when his disability is occasioned by an injury suffered from an accident arising out of and in the course of his employment. The Act should be liberally construed in harmony with its humane purpose.

Barnett v. D. L. Bromwell, Inc., 6 Va. App. 30, 33-34, 366 S.E.2d 271, 272 (1988) (en banc) (citation omitted).

Extrapolating from these principles, it stands to reason that, "in order to work a forfeiture" of post-termination wage-loss benefits under Murphy, the injured employee's post-termination wage loss must be *both* "'properly attributable to [the employee's] wrongful act . . . [for which the] employee is responsible,'" Eppling, 18 Va. App. at 129, 442 S.E.2d at 222 (alterations in original) (quoting Murphy, 12 Va. App. at 640, 406 S.E.2d at 193), *and* not properly attributable to the employee's work-related injury, see Johnson, 224 Va. at 601, 299 S.E.2d at 345; Watson, 219 Va. at 833, 252 S.E.2d at 312-13; Cash, 18 Va. App. at 633-34, 446 S.E.2d at 157-58; Timbrook, 17 Va. App. at 597, 439 S.E.2d at 875. In other words, a claimant's discharge from selective employment for willful misconduct does not, in itself, preclude the claimant from receiving post-termination wage-loss benefits if it is shown that the claimant's misconduct was properly attributable to his or her work-related injury.[5] Eppling, 18 Va. App. at 128, 442 S.E.2d at 221. Thus, the determining factors in a case such as this are not solely the nature and willfulness of the misconduct that led to the injured employee's termination, but also

---

[5] In asking in its "overriding inquiry" solely whether "the claimant [was] fired because of his disability[] or . . . because of his misconduct," and requiring the claimant "to demonstrate that his termination was attributable to his disability rather than his wrongful act," the majority wholly fails to consider whether the wrongful act or misconduct for which the claimant was fired was properly attributable to his work-related injury.

- 24 -

the nature of the relationship, if any, between that misconduct and the employee's work-related injury.

For example, in Timbrook, this Court determined that an injured employee's discharge from selective employment for work-related misconduct did not bar her right to post-termination compensation benefits because, among other reasons, the employee "was discharged for a 'reason[] concerning [her] disability.'" 17 Va. App. at 599, 439 S.E.2d at 876. Conversely, in Richfood, Inc. v. Williams, 20 Va. App. 404, 409, 457 S.E.2d 417, 419 (1995) (emphases added), this Court held that an injured employee who was discharged from selective employment for work-related misconduct was not entitled to further disability benefits because "the reason for [the employee's] termination was *unrelated to his injury* and was due *solely* to his misconduct." Likewise, in Reese, 24 Va. App. at 338-39, 482 S.E.2d at 97-98, this Court concluded that a partially disabled employee was not entitled to compensation for her post-termination wage loss because the employee's termination from selective employment for her "repeated negligent errors" at work was not caused by her compensable injury. This Court further explained in Reese:

> In this case, the evidence established as a matter of law that claimant's wrongful acts . . . *and not her injury or disability*, caused her wage loss. Thus, this loss was not employer's responsibility. The evidence established that claimant's termination was *unrelated to her injury* and was due *solely* to her misconduct. . . . In this case, credible evidence established that claimant's failure to properly perform her job was caused by her incompetence, *not her injury. No credible evidence showed that claimant's mistakes were caused by her injury or its residual effects*.

Id. (emphases added).

Accordingly, in order to prevail on his claim for post-termination workers' compensation benefits in this case, Artis, having effectively conceded that he was properly fired for cause from selective employment provided by employer, had to prove by a preponderance of the evidence

- 25 -

that his termination from selective employment was properly attributable to his October 2, 1999 compensable industrial accident "or its residual effects." Id.; see also Hungerford Mechanical Corp. v. Hobson, 11 Va. App. 675, 678, 401 S.E.2d 213, 215 (1991) (holding that the claimant has the burden of establishing by a preponderance of the evidence that he or she is entitled to compensation).

II.

The commission found that Artis's discharge and resultant wage loss were not attributable to his October 2, 1999 industrial accident but rather solely to his misconduct in feigning the robbery on June 29, 2000, for which he was responsible. In reaching that decision, the commission wholly rejected Dr. Harris's opinion that "the feigned robbery . . . resulted directly from . . . Artis's accident-related psychiatric condition." Relying instead on Dr. Harris's treatment notes and Artis's testimony, the commission found that Artis's misconduct was the result of his "anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma." Such problems, the commission found, were "of a nature more akin to stress resulting from an employee's interaction with his supervisors, which is not compensable," under Teasley, 14 Va. App. 45, 415 S.E.2d 596. The commission added that Artis had "pre-existing problems with anger or 'rage.'"

The determination whether a claimant's post-termination wage loss is causally related to his compensable injury by accident is a finding of fact. See Reese, 24 Va. App. at 335, 337, 482 S.E.2d at 96-97; Ingersoll-Rand Co. v. Musick, 7 Va. App. 684, 688, 376 S.E.2d 814, 817 (1989).

> If there is evidence, or reasonable inferences can be drawn from the evidence, to support the [c]ommission's findings, they will not be disturbed on review, even though there is evidence in the record to support a contrary finding. Although the findings of the . . .

- 26 -

> [c]ommission, if based on credible evidence, are conclusive and binding upon us, the [c]ommission's findings of fact are not binding upon us when there is no credible evidence to support them. The question of the sufficiency of the evidence then becomes one of law. The trier of fact must determine the weight of the testimony and the credibility of the witnesses, but it may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with facts in the record.

Morris v. Badger Powhatan/Figgie Int'l, Inc., 3 Va. App. 276, 279, 348 S.E.2d 876, 877 (1986) (citations omitted). Thus, "[u]nless this Court determines that, as a matter of law," Artis proved by a preponderance of the evidence that his termination from selective employment was properly attributable to his October 2, 1999 compensable industrial accident, the commission's "contrary finding is binding and conclusive." Owens v. Virginia Dept. of Transp., 30 Va. App. 85, 87, 515 S.E.2d 348, 349 (1999). "In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991).

Moreover,

> [w]hether credible evidence exists to support a factual finding is a question of law which is properly reviewable on appeal. Causation is a factual determination to be made by the commission, but the standards required to prove causation and whether the evidence is sufficient to meet those standards are legal issues which we must determine. In considering whether credible evidence exists to support the necessary factual findings, we view the evidence in the light most favorable to the party prevailing below.

Hercules v. Gunther, 13 Va. App. 357, 361, 412 S.E.2d 185, 187 (1999) (citations omitted).

"A finding of causation need not be based exclusively on medical evidence. 'The testimony of a claimant may also be considered in determining causation, especially where the medical testimony is inconclusive.'" Lee County Sch. Bd. v. Miller, 38 Va. App. 253, 260, 563 S.E.2d 374, 377-78 (2002) (quoting Dollar Gen'l Store v. Cridlin, 22 Va. App. 171, 176, 468

- 27 -

S.E.2d 152, 154 (1996)).  Furthermore, while "[m]edical evidence is not necessarily conclusive, but . . . subject to the commission's consideration and weighing," Hobson, 11 Va. App. at 677, 401 S.E.2d at 215, "'[i]n matters . . . which are not of common knowledge [the trier of fact] must accept the opinion of experts.  There is no other way in which an intelligent conclusion can be reached . . . .'" Walrod v. Matthews, 210 Va. 382, 389, 171 S.E.2d 180, 185 (1969) (quoting Lawson v. Darter, 157 Va. 284, 293, 160 S.E. 74, 77 (1931)); see also Seneca Falls Greenhouse & Nursery v. Layton, 9 Va. App. 482, 487, 389 S.E.2d 184, 187 (1990) (noting, in reference to a neuropsychologist's opinion regarding the causal connection between the claimant's disabling mental condition and his industrial accident, that, in matters that "are not common knowledge, the court must accept the opinion of experts"); cf. Velasquez v. Commonwealth, 263 Va. 95, 103, 557 S.E.2d 213, 218 (2002) (observing that the purpose of expert testimony is "to assist the trier of fact to understand the evidence presented or to determine a fact in issue" in matters that require a "'knowledge of a subject beyond that of persons of common intelligence and ordinary experience'" (quoting Neblett v. Hunter, 207 Va. 335, 339, 150 S.E.2d 115, 118 (1966))); Code § 8.01-401.3 ("In a civil proceeding, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.").

Further guidance is provided by the long-standing principle that,

> when an attending [medical expert] is positive in his diagnosis of a disease, great weight will be given by the courts to his opinion. However, when it appears . . . that the diagnosis is shaded by doubt, and there is medical expert opinion contrary to the opinion of the attending [medical expert], then the trier of the fact is left free to adopt that view which is most consistent with reason and justice.

Bristol Builders Supply Co. v. McReynolds, 157 Va. 468, 471, 162 S.E. 8, 9 (1932).

Applying these principles to the instant case, I conclude that, as a matter of law, there is no credible evidence in the record to support the commission's finding that Artis was discharged from selective employment for reasons unrelated to his compensable work-related accident. To the contrary, I find that all of the relevant credible evidence in the record plainly supports the conclusion that Artis's action in feigning the robbery was directly related to his October 2, 1999 work-related accident.

The relevant evidence is undisputed. On October 2, 1999, Artis was involved in a traffic accident in which he unavoidably struck and killed a pedestrian with his delivery truck while working for employer. Because of that accident, Artis suffered from numerous emotional problems, including flashbacks of the accident, fear of driving and crossing the street, anxiety attacks, feelings of being a killer, trouble sleeping and getting out of bed, and problems maintaining an erection. Dr. Harris, a clinical psychologist who first treated Artis ten days after the accident and continued treating him several times a month thereafter through at least July 2000, noted at intake that, having suffered the accident, Artis was a "nervous, tense/anxious, depressed, agitated, phobic male who was fully oriented with sad, hopeless, and depressed affect, and depressed/irritable mood," and who "was having trouble containing paranoid, hostile, and violent urges secondary to his anxious, agitated feelings." Dr. Harris specifically diagnosed Artis as suffering from post-traumatic stress disorder directly caused by the October 2, 1999 industrial accident. Dr. Harris was positive in his diagnosis, and no evidence from any other mental health expert was provided to contradict that diagnosis. Employer accepted Artis's psychological injury as compensable and voluntarily authorized and paid for treatment of that condition.

At no point between October 12, 1999, and June 29, 2000, did Dr. Harris release Artis to full employment or otherwise indicate that Artis had recovered from his accident-related

- 29 -

psychological injury. To the contrary, as Dr. Harris noted in his contemporaneous treatment notes, although Artis was able to achieve "brief periods of higher level driving function" at times, he continued to "need to temporarily self-modify his own driving exposure" when the symptoms of his disorder affected his ability to drive safely. Indeed, the commission noted that Artis was still on selective employment at the time of the feigned robbery. Moreover, Dr. Harris's treatment notes indicate that Artis's underlying mental disorder continued throughout that period and adversely affected his ability to problem solve, control negative thoughts, and manage stress and anger during that entire time.

As late as March 3, 2000, Dr. Harris wrote that, having started driving a new route on his own, Artis was thinking "more about violence" and had concerns about his ability to control his anger. Dr. Harris further noted that Artis would need a rider to assist him on the route. On April 7, 2000, Dr. Harris indicated in his notes that Artis was having flashbacks of a "man running in front of [his] truck." On April 27, 2000, Dr. Harris wrote that Artis was feeling "rage" and was going to terminate his medication. On May 4, 2000, Dr. Harris noted Artis was upset because employer had assigned him to drive the route where the fatal accident had occurred on October 2, 1999, and insisted that he do so even though Artis explained to employer that he was "having trouble sleeping," was "having flashbacks," and was off his prescription medication at that point. Dr. Harris further noted that Artis was feeling "pushed, trapped like [a] cornered animal [and] rage." That same day, Dr. Harris sent a letter to employer, stating that Artis was "greatly stressed and somewhat regressed, secondary to being scheduled to service the route where his accident occurred on October 2, 1999." Dr. Harris further stated in his letter that Artis was "clinically not ready to service that particular route at this time. He has made much progress in his therapy and his rehabilitation is progressing well. It is however important that we continue to work closely together towards supporting his full recovery."

Dr. Harris's records from June 7, 2000, indicate that Artis was experiencing symptoms, including homicidal feelings. On June 14, 2000, Dr. Harris noted that Artis was told by employer that he could not get any more riders to assist him on his routes. Dr. Harris further noted that he would call or write employer regarding Artis's "need for a rider from time to time" and that he recommended Artis continue with his medication.

On July 18, 2000, less than three weeks after Artis feigned the robbery, Dr. Harris opined that Artis's involvement in the June 29, 2000 incident was "related to" Artis's diagnosis of post-traumatic stress disorder. Dr. Harris further opined on September 24, 2002, that, as a result of the October 2, 1999 accident, Artis suffered from chronic post-traumatic stress disorder. Dr. Harris also opined on September 24, 2002, that "the feigned robbery of 06/29/00 resulted directly from Mr. Artis's accident-related psychiatric condition. Mr. Artis was still actively traumatized by his 10/02/99 fatality, on 06/29/00. He was also frustrated, angry, fearful and problem-solving very poorly at that time. He was sleep deprived [with] suicidal ideation as well." Again, Dr. Harris was positive in his diagnosis and opinion, and no other mental health professional's opinion was offered to refute Dr. Harris's assessment.

I find nothing in the record, particularly in Dr. Harris's treatment notes and Artis's testimony, that is inconsistent with Dr. Harris's diagnosis and opinion. Despite rejecting Dr. Harris's opinion, the commission identified no such specific inconsistency in the record. Clearly, Artis never testified that his feigning the robbery was unrelated to his October 2, 1999 accident. Nor does anything in Dr. Harris's extensive treatment records suggest that the two incidents were not causally related. Indeed, Dr. Harris's notations and Artis's testimony regarding Artis's "anger at his employer[] and frustration over his financial status" are not only consistent with but also clearly rooted in the documented post-traumatic stress disorder symptoms suffered by Artis during the treatment period, from his inability to contain his

"paranoid, hostile, and violent urges" to his sleep deprivation and inability to problem solve,

control negative thoughts, and manage stress and anger. As such, Dr. Harris's notations and

Artis's testimony fully comport with Dr. Harris's opinion that Artis's involvement in the June

29, 2000 incident was causally related to his accident-related psychological disorder.

Dr. Harris's unequivocal expert opinion may not, therefore, be disregarded by the commission as

"inherently incredible" or "inconsistent with other facts in the record." Hercules, 13 Va. App. at

361, 412 S.E.2d at 187; see also McReynolds, 157 Va. at 471, 162 S.E. at 9. Accordingly, the

commission could not properly rely solely on isolated portions of Dr. Harris's notes and Artis's

testimony that were not inconsistent with Dr. Harris's expert opinion to arbitrarily discount that

opinion and to conclude on its own, in a matter that is clearly beyond common knowledge, that

Artis's feigning the robbery was not causally related to his industrial accident.[6] See Walrod, 210

---

[6] Relying on John v. Im, 263 Va. 315, 559 S.E.2d 694 (2002), the majority states that the commission was not required to accept the uncontradicted opinion of Dr. Harris that Artis's misconduct was directly related to his work-related injury because Dr. Harris is only a psychologist and "not a medical doctor." In my view, John, an automobile accident liability case involving the admissibility of an expert's opinion offered to prove that the plaintiff sustained a physical injury, has no bearing on this case. In John, the Supreme Court held that the expert witness, who was a licensed psychologist rather than a medical doctor, was "not qualified to state an expert medical opinion regarding the cause of [a physical human] injury" because such an opinion "is part of the practice of medicine." Id. at 321, 559 S.E.2d at 697. In other words, an expert witness may not render an opinion regarding a subject outside his or her field of expertise. Here, unlike in John, not only was the admissibility of Dr. Harris's opinion never contested, Dr. Harris's opinion was not about a "physical injury." Rather, he opined solely that Artis's feigning the robbery was a direct result of his post-traumatic stress disorder, which itself was a direct result of his work-related accident. It is well settled in Virginia that clinical psychologists with the proper training, expertise, and experience are generally qualified to give expert testimony regarding a person's mental condition and to state an expert *medical* opinion regarding the relationship between that person's mental condition and his or her conduct. See, e.g., Ward v. Commonwealth, 264 Va. 648, 653, 570 S.E.2d 827, 831 (2002) (holding that a clinical psychologist was properly permitted to give expert testimony "about the victim's mental condition"); Rollins v. Commonwealth, 207 Va. 575, 581, 151 S.E.2d 622, 626 (1966) (stating that "the use of the psychologist in present society is growing and with this will come an increasing tendency to call him as an expert witness on the question of mental condition" (internal quotation marks omitted)); Code § 19.2-169.5 (providing that a qualified clinical psychologist may be appointed by the trial court "to evaluate [a] defendant's sanity at the time of the offense and, where appropriate, to assist in the development of an insanity defense"); cf.

- 32 -

Va. at 389, 171 S.E.2d at 185; Layton, 9 Va. App. at 487, 389 S.E.2d at 187. To do so on this record, despite the egregious nature of Artis's misconduct, undermines the purpose of the Workers' Compensation Act.[7]

Likewise, the commission's reliance on this Court's decision in Teasley, 14 Va. App. 45, 415 S.E.2d 596, to resolve the issue presented in this case is misplaced.

> In Teasley, the employee, *following an ongoing series of disagreements*, had a confrontation with his supervisor over his work assignments. He broke down emotionally and was diagnosed with [post-traumatic stress disorder due to the workplace confrontation]. He sought benefits, contending that his [post-traumatic stress disorder] was an occupational disease. The commission . . . denied the employee's claim because he failed to prove entitlement to compensation under Code § 65.1-46.1 (now Code § 65.2-401).

---

Code § 54.1-3600 (defining the "*[p]ractice of clinical psychology*" as, *inter alia*, the "*[d]iagnosis . . . of mental and emotional disorders*"). Hence, the rule stated in John does not apply here to allow the commission to disregard Dr. Harris's expert medical opinion simply because he is a psychologist rather than a psychiatrist.

[7] As Artis points out on appeal, however, certain types of misconduct would prevent a claimant like him from receiving post-termination workers' compensation benefits. For example, Code § 65.2-510.1(A) provides as follows:

> Whenever an employee is imprisoned in a jail, state correctional facility, or any other place of incarceration and (i) the imprisonment resulted from the employee's conviction of a criminal offense and followed his sentencing therefor by a court of competent jurisdiction, (ii) the employee is receiving compensation for temporary total incapacity pursuant to § 65.2-500 or temporary partial incapacity under § 65.2-502, and (iii) the employee is medically released to perform selective employment, compensation benefits for wage loss shall be suspended under § 65.2-708 upon filing of a proper application to the [c]ommission.

Furthermore, before a partially disabled claimant may receive wage-loss compensation, the claimant must first prove that he or she has adequately marketed his or her residual work capacity. See Washington Metro. Area Transit Auth. v. Harrison, 228 Va. 598, 600-01, 324 S.E.2d 654, 655-56 (1985); Watts v. P & J Hauling, Inc., 41 Va. App. 278, 286, 584 S.E.2d 457, 461 (2003). An incarcerated claimant would be unable to establish this required element because the claimant's incarceration would constitute a removal from the labor market. See, e.g., Baskerville v. Saunders Oil Co., 1 Va. App. 188, 193, 336 S.E.2d 512, 514-15 (1985).

Mottram v. Fairfax County Fire & Rescue Dep't, 35 Va. App. 85, 94, 542 S.E.2d 811, 814-15 (2001) (emphasis added) (citing Teasley, 14 Va. App. at 49-50, 415 S.E.2d at 598-99), aff'd in part and rev'd in part, 263 Va. 365, 375, 559 S.E.2d 698, 703 (2002). Holding that "purely psychological disability" resulting from "disagreements over managerial decisions and conflicts with supervisory personnel that cause stressful consequences . . . ordinarily are not compensable," we affirmed that decision. Teasley, 14 Va. App. at 49, 415 S.E.2d at 598.

Here, unlike in Teasley, it is undisputed that Artis's post-traumatic stress disorder arose from his October 2, 1999 work-related accident when he unavoidably killed a pedestrian, and not because of any disagreements or conflicts with employer. The relevant question here, therefore, is not whether Artis had angry disagreements with his employer, but whether he was unable to appropriately manage his anger towards employer and desist from acting on that anger because of the continuing psychological trauma of his work-related accident. The only evidence in the record that answers that question was provided by Dr. Harris, who clearly attributed the feigning of the robbery to the post-traumatic stress disorder Artis suffered. Dr. Harris unequivocally stated that the misconduct "resulted directly from Mr. Artis's accident-related psychiatric condition." Dr. Harris further stated that Artis was "still actively traumatized" at the time of the feigned robbery by his work-related accident. As a result, Dr. Harris stated, Artis was "frustrated, angry, fearful," and sleep deprived at the time of the feigned robbery, as well as exhibiting poor problem-solving ability and suicidal ideation. Dr. Harris further stated that, "[i]n Artis's mind[,] [the feigned robbery] was not an act of robbery, but one of symbolically regaining his loss of control." Hence, Teasley is inapplicable here.

Furthermore, the commission's vague reliance on the fact that Artis had a prior problem with rage as a dispositive factor in this case is also misplaced. While Artis indicated in his intake questionnaire with Dr. Harris that he had received prior psychological treatment for "rage" in

1996, no evidence was presented showing the precise nature or severity of that problem or the treatment therefor. Moreover, no evidence was presented to show that such a condition persisted three years later in 1999. Indeed, nothing in the record supports the commission's conclusion that the rage that resulted in the feigned robbery was simply a recurrence or continuation of Artis's earlier condition or that it was wholly unrelated to Artis's post-traumatic stress disorder. To the contrary, Artis testified that he had not previously suffered any symptoms similar to those he suffered as a result of his work-related accident. Artis's testimony was uncontradicted. In addition, Dr. Harris testified that Artis's post-traumatic stress disorder prevented him from properly managing his anger. Significantly, Dr. Harris was clearly aware of that notation by Artis in the questionnaire when he opined that Artis's conduct on June 29, 2000, was directly related to the October 2, 1999 accident. Dr. Harris drew no causal connection, in his treatment notes or elsewhere, between the prior condition noted by Artis and Artis's psychiatric disorder resulting from the accident. Nor, as previously noted, did any other health care professional do so in the record.

In addition, even assuming Artis's prior treatment for rage was relevant, "[i]t is well established that the employer takes the employee as the employer finds the employee, even where the employee suffers some [pre-existing] infirmity." Williams Indus., Inc. v. Wagoner, 24 Va. App. 181, 187-88, 480 S.E.2d 788, 791 (1997); see also Owens, 30 Va. App. at 88, 515 S.E.2d at 350 ("The fact that [claimant] previously suffered from PTSD, and that this incident only aggravated a pre-existing condition, is not fatal to his claim."). "A finding that a pre-existing condition 'was accelerated or aggravated' by an injury sustained in an industrial accident establishes a causal connection between the injury and disability[,] and the 'disability resulting therefrom is compensable under the Workers' Compensation Act.'" Southern Iron Works, Inc. v. Wallace, 16 Va. App. 131, 134, 428 S.E.2d 32, 34 (1993) (quoting Olsten of

Richmond v. Leftwich, 230 Va. 317, 320, 336 S.E.2d 893, 895 (1985)).  Plainly, if Artis had a pre-existing psychological condition, the evidence in this case shows that Artis's traumatic October 2, 1999 accident was sufficiently sudden, shocking, and frightful to have accelerated or aggravated that condition.  See Owens, 30 Va. App. at 88, 515 S.E.2d at 350 (holding that, to be compensable, the aggravation of a pre-existing psychological condition must be "causally related to (1) a physical injury or (2) to an obvious sudden shock or fright in the employment").  Therefore, the mere, undeveloped fact that Artis received treatment for a prior psychological condition in 1996 is not persuasive evidence to show that Artis's discharge from selective employment was not properly attributable to the psychiatric disability he suffered as a direct result of his October 2, 1999 compensable accident.

Thus, based on the record in this case, I would hold, as a matter of law, that no credible evidence supports the commission's finding of fact that Artis's post-termination wage loss was causally related solely to his misconduct on June 29, 2000, and not to his October 2, 1999 compensable injury by accident.  I would further hold that, in proving by a preponderance of the evidence that his feigning the robbery and resultant discharge from selective employment and wage loss were causally related to his October 2, 1999 compensable industrial accident, Artis met his burden of proving his entitlement to compensation for his post-termination wage loss.  Dr. Harris's unequivocal expert opinion was that Artis suffered from post-traumatic stress disorder resulting from his October 2, 1999 compensable accident and that Artis's actions on June 29, 2000, resulted directly from that psychological disorder.  No evidence contradicts Dr. Harris's opinion, and I find no internal conflict in it.  In fact, Dr. Harris's treatment notes and letters demonstrate the existence of an unbroken causal connection between Artis's work-related accident and his feigning the robbery.  Thus, the uncontradicted evidence presented in this case establishes, as a matter of law, that Artis's termination from selective employment was causally

related and, thus, properly attributable to his compensable work-related accident and the resultant disability. Thus, consistent with the purpose of the Workers' Compensation Act, employer is responsible for Artis's resulting post-termination wage loss. See Reese, 24 Va. App. at 338, 482 S.E.2d at 97.

III.

In summary, I would hold that an injured employee's firing for cause does not, in itself, automatically foreclose post-termination wage-loss compensation. If it is shown that the reason for the termination (e.g., the employee's misconduct) was properly attributable to the employee's work-related injury, the employee is entitled to benefits. I would further hold that, under the facts presented in this case, the commission erred in finding Artis had not met his burden of showing that his post-termination wage loss was properly attributable to his industrial accident. In focusing in its analysis primarily on the nature of Artis's misconduct, rather than on the underlying causal effect of Artis's work-related injury on his conduct, and permitting the commission to arbitrarily discount Dr. Harris's uncontroverted opinion regarding the causal connection between Artis's misconduct and the psychological disorder he suffered as a result of his industrial accident, the majority appears to disregard the essential purpose of the Workers' Compensation Act, which is to compensate disabled workers for wage losses properly attributable to industrial accidents.

For these reasons, I would reverse the commission's decision denying Artis's claim for post-termination temporary partial disability benefits, enter judgment in favor of Artis, and remand this case to the commission for the purpose of calculating the appropriate benefits.

C O R R E C T E D   C O P Y

Tuesday                    13th

July, 2004.


Phillip L. Artis,                                                                              Appellant,

 against          Record No. 2157-03-4
                 Claim No. 201-21-75

Ottenberg's Bakers, Inc. and
  Reliance National Indemnity Co.,                                      Appellees.


Upon a Petition for Rehearing En Banc

Before Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner, Frank, Humphreys, Clements, Felton, Kelsey and McClanahan


On June 14, 2004 came the appellees, by counsel, and filed a petition praying that the Court set aside the judgment rendered herein on June 1, 2004, and grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered herein on June 1, 2004 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellees shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter.  It is further ordered that the appellees shall file with the clerk of this Court twelve additional copies of the appendix previously filed in this case.


A Copy,

Teste:

                                        Cynthia L. McCoy, Clerk
                 By:

                 Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Fitzpatrick, Judges Humphreys and Clements
Argued at Alexandria, Virginia


PHILLIP L. ARTIS

                                                                OPINION BY
v.        Record No. 2157-03-4            JUDGE JEAN HARRISON CLEMENTS
                                                                JUNE 1, 2004
OTTENBERG'S BAKERS, INC. AND
 RELIANCE NATIONAL INDEMNITY CO.


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Craig A. Brown (Ashcraft & Gerel, LLP, on brief), for appellant.

            Joseph F. Giordano (Vanessa L. Crockett; Semmes, Bowen &
            Semmes, P.C., on brief), for appellees.


        Phillip L. Artis (claimant) appeals a decision of the Workers' Compensation Commission

(commission) denying his claim for temporary partial disability benefits following his

termination from selective employment provided by Ottenberg's Bakers, Inc. (employer).

Claimant contends the commission erred in finding that he failed to prove his post-termination

wage loss was attributable to his compensable work-related psychiatric disorder. We agree and,

therefore, reverse and remand.

                                    I.  BACKGROUND

        The relevant facts in this case are not in dispute. On October 2, 1999, claimant was

employed as a route salesman for employer. On that day, at approximately 3:45 a.m., while en

route in a delivery truck to one of employer's customers, claimant came upon an apparent "road

rage" incident on Interstate 66 in Fairfax County. Several people involved in the incident exited

their vehicles and ran across the highway in front of claimant's truck. The last person attempting

to cross the highway darted directly in the path of claimant's vehicle. Although claimant

attempted to avoid hitting that person, he was unable to do so. Claimant's vehicle struck and killed the individual. Claimant, who was in a "daze" and hyperventilating after the accident, called employer to report the accident. He informed employer's representative that he was too distraught to finish his shift, but was told he had to because employer had no one available to replace him. Claimant finished his route, completed his paperwork, and drove himself home.

Claimant missed some work after the accident. He testified that, following the accident, he began to experience flashbacks and fear "that it would happen again" and that he would be "thought of as a killer." Those feelings, he testified, caused him to experience "depression to the point . . . [he] was suicidal." His children, he further testified, "wanted to know why [he] was not getting out of bed or why [he] couldn't take them certain places." Eventually, claimant returned to work in a selective duty capacity, riding with other drivers at first and then driving different routes, sometimes with a co-driver along to assist him. Claimant testified he "was returned to full duty with the stipulation if I need help, ask the night manager and that would be provided, and that was refused on a few occasions."

The medical records in this case indicate that, on October 4, 1999, claimant sought medical treatment for back pain at the Providence Hospital Wellness Institute. He was diagnosed with a thoracic strain and excused from work through October 10, 1999. As of October 21, 1999, claimant's back pain had resolved.

On October 11, 1999, claimant returned to the Providence Hospital Wellness Institute for a follow-up evaluation. He reported that he was unable to drive and was suffering from emotional distress due to the accident.

On October 12, 1999, claimant came under the care of Dr. Cecil Harris, a clinical psychologist, for his emotional problems stemming from the fatal accident, including flashbacks of the accident, fear of driving and crossing the street, anxiety attacks, feelings of being a killer,

trouble sleeping and getting out of bed, and problems maintaining an erection. Claimant's initial mental status examination by Dr. Harris "revealed a nervous, tense/anxious, depressed, agitated, phobic male who was fully oriented with sad, hopeless, and depressed affect, and depressed/irritable mood" and who "denied suicidal and homicidal ideation and was having trouble containing paranoid, hostile, and violent urges secondary to his anxious, agitated feelings." Claimant indicated in his intake questionnaire with Dr. Harris that he had received prior psychological treatment for "rage" in 1996 from Dr. Jones.

Dr. Harris diagnosed claimant as suffering from "PTSD" (posttraumatic stress disorder) and "Adjustment Disorder with Mixed Anxiety and Depressed Mood." Dr. Harris initiated a "treatment plan of twice weekly, or as needed psychotherapy." Claimant received "generally weekly and sometimes bi-weekly" counseling treatment from Dr. Harris through at least July 2000. As part of his treatment, claimant also took Zyprexa, which was provided, on Dr. Harris's referral, by Dr. Walker Lyerly. Dr. Harris recommended that, in returning to work as a delivery truck driver, claimant should initially ride with another driver, then have another driver ride with him, and ultimately, "when ready," drive by himself.

Dr. Harris saw claimant for treatment five more times in October 1999. On October 14, 1999, Dr. Harris wrote in his contemporaneous treatment notes that claimant was "again unable to drive to session" and felt "angry, hostile[,] resentful, critical [and] competitive." On October 19, 1999, Dr. Harris noted that claimant "present[ed] [with] anxious, depressed affect." On October 22, 1999, Dr. Harris noted that claimant "presented [with complaints of] '"difficulty falling asleep, depressed, unable to get up in morning and loss of interest in sex.'" On October 25, 1999, Dr. Harris noted that claimant was "back to work" with a rider. He further noted that claimant was feeling a "lack of support from [employer]." On October 26, 1999, Dr. Harris noted that claimant was feeling employer was unsupportive because "they think I'm a killer."

On November 1, 1999, Dr. Harris noted that, while claimant was "making progress," he was "anxious [regarding his] driving/riding situation." Dr. Harris further noted that claimant was concerned employer was "not patient [with] him" and that claimant had "[f]ears [and] concerns [regarding his] ability to take care of his family." On November 15, 1999, Dr. Harris noted that claimant had "difficulty sleeping [secondary to] recurrent intrusive thoughts[:] leaves him tired, irritable [and] depressed." On November 19, 1999, Dr. Harris noted that claimant was experiencing increased fear at work because he was now riding with another driver "through D.C. traffic," but was "very pleased he was able to drive to [appointment with Dr. Harris] for first time using Beltway." On November 26, 1999, Dr. Harris noted that claimant was "feeling paranoid [regarding] job's support of his recovery efforts."

On December 17, 1999, Dr. Harris noted that claimant had been "serving as a co-driver since" mid-November 1999 and driving with a co-driver since December 8, 1999. On December 23, 1999, Dr. Harris noted that claimant had "[i]ssues related to driving assignment, symptomatic behavior [and] anger [regarding] perceived lack of full support by [employer]." On January 6, 2000, Dr. Harris noted that claimant was feeling "rage, agitation, depress[ion and] hopeless[ness]" and admitted "some suicidal ideations." On January 13, 2000, Dr. Harris noted that claimant was driving "solo," but continued "to feel lack of support at" work. On January 28, 2000, Dr. Harris noted that claimant was angry with "H.R. Dir. B.W. [and] Plant Mgr. J.G. for lack of support" because he was "not getting sick days approved" for his therapy sessions and was "assigned [a] route too difficult for his level of recovery at this time." On February 11, 2000, Dr. Harris noted that claimant felt employer was not supporting him because it was pressuring him to schedule his medical appointments "on his days off" and was failing to pay sick leave. On February 15, 2000, Dr. Harris noted that claimant was "still angry" and feeling "set up" to fail by employer. On February 18, 2000, Dr. Harris noted that claimant was "feeling

better" and slept the "last few nights [with] no flashback of seeing accident victim run in front of vehicle in his dreams." Dr. Harris further noted that claimant had been riding with another driver on a new route to Baltimore and would be driving "some on his own for next few months."

In addition to documenting claimant's feelings that employer was not being supportive, Dr. Harris's treatment notes also contain several references to claimant's concerns about caring for his family. Throughout the sessions, Dr. Harris indicated in his notes that his treatment of claimant's condition consisted of providing "ventilation," encouragement, support, and reinforcement of claimant's strengths and progress, and focusing on claimant's troubles with problem solving, anger and stress management, and "thought stopping."

On March 3, 2000, Dr. Harris noted that claimant, having begun driving the new route on his own, felt his symptoms were increasing and he was "taking a step backward." Dr. Harris further noted that claimant was thinking negative thoughts, including "more about violence," and was "worried" about his ability to control his anger. Dr. Harris also noted that claimant felt he would need a rider to assist him on his route. On April 7, 2000, Dr. Harris noted that claimant's request for a rider was denied and claimant was having "[i]ntrusive recollections of [a] man running in front of truck." On April 27, 2000, Dr. Harris noted that claimant was feeling "rage" and was again feeling unsupported by employer. Dr. Harris further noted that claimant requested a change in his medication prescription and would "terminate" his current medication, pending referral to a medical doctor.

On May 4, 2000, Dr. Harris noted claimant was upset because employer had assigned him to drive the route where the fatal accident had occurred on October 2, 1999, and insisted that he do so even though claimant explained to employer that he was "having trouble sleeping," was "having flashbacks," and was off his prescription medication at that point. Dr. Harris further noted that claimant was feeling "pushed, trapped like [a] cornered animal [and] rage." That

same day, Dr. Harris wrote to William Walker, employer's human resources director, stating that claimant was "greatly stressed and somewhat regressed, secondary to being scheduled to service the route where his accident occurred on October 2, 1999." Claimant, Dr. Harris wrote, "is clinically not ready to service that particular route at this time. He has made much progress in his therapy and his rehabilitation is progressing well. It is however important that we continue to work closely together towards supporting his full recovery."

On May 9, 2000, Dr. Harris noted that claimant reported "suicidal ideation" and was feeling "provoked into his rageful feelings" because employer was "messing" with him. On June 1, 2000, Dr. Harris noted that claimant had increased "confidence to move forward now [without] a rider," but also noted that claimant described himself as homicidal. On June 7, 2000, Dr. Harris noted that claimant "feels he is coping [with] new route," but again noted claimant was experiencing symptoms, including homicidal feelings. On June 14, 2000, Dr. Harris noted that claimant had been "given a rider on Monday, which helped," but was told by the new dispatcher "that there would be no new approval for a new rider." Dr. Harris further noted that he would call or write employer regarding claimant's "need for a rider from time to time" and that he recommended to claimant that he continue with his medication. Dr. Harris's June 14, 2000 report indicated that claimant was feeling homicidal and that claimant could not function at his job.

Claimant testified that, at the time, he blamed Walker for denying him a "ride along helper." Claimant further testified that he believed, at the time, that Walker "was operating to get [him] out of the company."

On June 29, 2000, claimant "faked" a robbery of the delivery truck he was driving and filed a false police report indicating he had been robbed of approximately $250. Claimant was arrested and subsequently pled guilty to the charge of filing a false police report. Following his

arrest, claimant was fired by employer. Claimant subsequently procured a series of jobs with various other employers.

Claimant testified he faked the robbery and filed the false report because he expected Walker to respond to the scene of the reported robbery, at which time he intended to kill him. His intention at the time, claimant testified, was "to do the same harm [to Walker that Walker] was doing to my family." He wanted to "get even" with Walker because Walker failed to adequately respond to his difficulties in performing his job after the October 2, 1999 accident. Claimant further testified that he staged the robbery attempt because "the bills were mounting" and he was having difficulty with child support issues at the time because employer "was delinquent on [his] child support that was being taken out every week and not being sen[t]." Claimant also testified that none of the factors that led to his wanting to kill Walker occurred prior to the October 2, 1999 accident and that he had never before suffered symptoms similar to those he suffered as a result of the accident.

On July 18, 2000, Dr. Harris wrote a letter to claimant's union president, in which he summarized his diagnosis and treatment of claimant for "Posttraumatic Stress Disorder" and concluded as follows:

> [Claimant] discussed in detail the incident of 06/29/00 in therapy. It is my opinion, based on the information I have, that [claimant's] involvement in this incident is related to his diagnosis.

On October 2, 2001, claimant filed a claim for benefits arising out of the accident on October 2, 1999. He alleged he "injured his back and suffered psychological injuries, including post-traumatic stress disorder as a direct result" of the compensable accident. Claimant sought medical benefits, an award of temporary total disability compensation from October 2, 1999,

through December 17, 1999, and temporary partial disability compensation for various periods following the termination of his employment with employer.[1]

In responding to a questionnaire sent to him by claimant's counsel on September 24, 2002, Dr. Harris wrote that his "accident-related diagnos[i]s" of claimant was "(PTSD) — Posttraumatic Stress Disorder — chronic." Asked if the work restrictions placed on claimant's employment because of his accident-related condition were permanent, Dr. Harris noted as follows:

> No, early return to driving alone was [and] is the goal. Periodically, depending on the situation there may be times when he may need to temporarily self-modify his own driving exposure. Consequently, he is not ready at this time to return to the type of driving he did at the time of his trauma. Over the course of our continued contact in his therapy off [and] on he has brief periods of higher level driving function followed by trauma-triggered dangerous aggressions in his driving skills.

Asked to explain the basis for his conclusion that "the feigned robbery resulted directly from [claimant's] accident-related psychiatric condition," Dr. Harris further noted as follows:

> I still hold the opinion that the feigned robbery of 06/29/00 resulted directly from [claimant's] accident-related psychiatric condition. [Claimant] was still actively traumatized by his 10/02/99 fatality, on 06/29/00. He was also frustrated, angry, fearful and problem-solving very poorly at that time. He was sleep deprived [with] suicidal ideation as well. In his mind this was not an act of robbery, but one of symbolically regaining his loss of control.

At the December 9, 2002 evidentiary hearing before the deputy commissioner, employer stipulated that claimant had experienced a compensable accident arising out of and in the course of his employment on October 2, 1999, when he unavoidably struck and killed a pedestrian on

---

[1] Pursuant to his claim, as modified at the hearing before the deputy commissioner, claimant sought temporary partial disability compensation for the following periods: July 14, 2000, through August 25, 2000; August 26, 2000, through September 9, 2000; September 30, 2000, through May 1, 2001; October 13, 2001, through April 30, 2002; and May 17, 2002, through November 9, 2002.

the highway. Employer also acknowledged that there was some injury to claimant's back and some psychological injury resulting directly from that accident. Employer further agreed that some compensation was voluntarily paid and that "psychiatric treatment [was] authorized and paid for at least up until a certain point." Employer defended the claim on the grounds that claimant was not disabled in the nature or to the extent alleged, that there was no causal relationship between the injury by accident and the subsequent periods of disability alleged by claimant, and that claimant was not entitled to any partial disability compensation after he was terminated for cause from his employer-supplied selective duty employment on June 29, 2000.

In addition to the parties' stipulations, the evidence before the deputy commissioner consisted, in relevant part, of claimant's testimony and the reports and opinions of Dr. Harris regarding his treatment of claimant's psychological condition. Based on the parties' stipulations, the deputy commissioner found that claimant "experienced a compensable injury by accident on October 2, 1999, as alleged, resulting primarily in a post-traumatic stress disorder." The deputy commissioner also determined that "claimant carried his burden of proving entitlement to temporary [total] disability compensation from October 4, 1999, through October 10, 1999," only. The deputy commissioner further held as follows:

> We further conclude that the employer's termination of the claimant on June 29, 2000, based upon his fabrication of a robbery and the filing of a false police report, was for justified cause sufficient to permanently bar the claimant's entitlement to partial wage loss compensation thereafter. . . . We further conclude that the claimant's wage loss after June 29, 2000, is properly attributable to his own conduct, and not to any disability resulting from the October 2, 1999 injury by accident. We reach this conclusion notwithstanding Dr. Harris'[s] opinion that on June 29, 2000, the claimant remained "actively traumatized" by the events of October 2, 1999, and that his action in feigning the robbery attempt was "one of symbolically regaining his loss of control." To the extent the claimant then felt pressured by the employer to resume his normal work activities, a conclusion we doubt based upon our assessment of the claimant's credibility, the claimant had

- 9 -

various other options available to him other than feigning a robbery so that he might attempt a murder.

Upon review, the full commission affirmed the deputy commissioner's decision, finding as follows:

> The evidence in this case establishes that the claimant was under some restrictions at the time of his discharge. He was discharged after he feigned a robbery with the intent to harm an individual employed by the employer. Dr. Harris implicated a variety of factors which led to this behavior, including the claimant's frustration and anger. A close review of Dr. Harris's contemporaneous treatment notes, as well as the claimant's testimony, demonstrates that the claimant's main problems were not directly related to his accident. The claimant's problems involved anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma. These problems are of a nature more akin to stress resulting from an employee's interaction with his supervisors, which is not compensable. See Teasley v. Montgomery Ward & Co., 14 Va. App. 45, 415 S.E.2d 596 (1992). We also note that the documentary [evidence] reveals pre-existing problems with anger or "rage," despite the claimant's denials to the contrary.
>
> We find that the totality of the evidence shows that the claimant was responsible for his wrongful actions on June 29, 2000. Under the circumstances presented, we agree that the claimant was discharged for justified cause, supporting the forfeiture of benefits.

This appeal by claimant followed.

## II. ANALYSIS

On appeal, claimant does not challenge employer's right to terminate him for feigning the robbery. He argues, however, that his termination from selective employment did not justify a forfeiture of subsequent workers' compensation benefits. The uncontradicted medical evidence in the record, he asserts, clearly demonstrates that his action in feigning the robbery on June 29, 2000, was caused by his psychiatric disability, which directly resulted from his October 2, 1999 compensable industrial accident. Hence, he contends the commission erred, as a matter of law,

- 10 -

in finding that he failed to meet his burden of proving that his termination and resulting wage loss were causally related to his accident and in ruling, based on that finding, that his discharge "for justified cause" precluded him from receiving post-termination temporary partial disability compensation.

Employer concedes on appeal, as it did below, that claimant suffered a compensable psychiatric injury, diagnosed as posttraumatic stress disorder, as a result of claimant's industrial accident on October 2, 1999. Employer asserts, however, that the credible evidence demonstrates that, having recovered from his accident-related mental disorder and having been released to work by Dr. Harris, claimant feigned the robbery on June 29, 2000, "in an attempt to obtain money to pay his bills" and because of his "anger at his employer, frustration over his financial status and child support payments, and perceived problems with employment issues not directly related to the Claimant's work accident." Such reasons, employer maintains in reliance on Teasley, 14 Va. App. 45, 415 S.E.2d 596, are unrelated to the compensable accident and, thus, do "not provide a basis for awarding compensation" following claimant's termination from selective employment. Moreover, employer asserts, the credible evidence demonstrates that claimant "had pre-existing mental health issues prior to the accident of October 2, 1999." Thus, employer argues, the commission correctly found that claimant "was wholly responsible for his wrongful acts on June 29, 2000" and that those acts were not related to his October 2, 1999 accident. Because the record contains credible evidence supporting the commission's factual findings, employer's argument continues, this Court is bound by those findings. Accordingly, employer concludes, the commission's ruling, based on those findings, that employer was not responsible for claimant's post-termination wage loss "must be affirmed." We disagree with employer's position.

- 11 -

In <u>Timbrook v. O'Sullivan Corp.</u>, 17 Va. App. 594, 597, 439 S.E.2d 873, 875 (1994), we explained that

> an employee on selective employment offered or procured by the employer, who is discharged for cause *and for reasons not concerning the disability*, forfeits his or her right to compensation benefits like any other employee who loses employment benefits when discharged for cause. <u>Goodyear Tire & Rubber Co. v. Watson</u>, 219 Va. 830, 833, 252 S.E.2d 310, 312-13 (1979); <u>Marval Poultry Co. v. Johnson</u>, 224 Va. 597, 601, 299 S.E.2d 343, 345 (1983). The reason for the rule is that the wage loss is attributable to the employee's wrongful act *rather than the disability*.

(Emphases added.) Thus, a discharge from selective employment does not "create a forfeiture of workers' compensation benefits" if "the reason for the discharge . . . concern[s]" the employee's disability. <u>Id.</u> at 598-99, 439 S.E.2d at 876. In <u>Eppling v. Schultz Dining Programs</u>, 18 Va. App. 125, 128, 442 S.E.2d 219, 221 (1994), we further explained:

> When a disabled employee is discharged from selective employment, the "inquiry focuses on whether the claimant's benefits may continue in light of [the] dismissal." <u>Richmond Cold Storage Co. v. Burton</u>, 1 Va. App. 106, 111, 335 S.E.2d 847, 850 (1985). An employee's workers' compensation benefits will be permanently forfeited only when the employee's dismissal is "justified," the same as any other employee who forfeits . . . benefits when discharged for a "justified" reason. <u>Id.</u>
>
> A "justified" discharge (one which warrants forever barring reinstatement of workers' compensation benefits) does not simply mean that the employer can identify or assign a reason attributable to the employee as the cause for his or her being discharged. Whether the reason for the discharge is for "cause," <u>see</u> [<u>Chesapeake & Potomac Telephone Co. v. Murphy</u>, 12 Va. App. 633, 639, 406 S.E.2d 190, 193, <u>aff'd en banc</u>, 13 Va. App. 304, 411 S.E.2d 444 (1991)], or is "justified" for purposes of forfeiting benefits must be determined in the context of the purpose of the Act[2] and whether the conduct is of such a nature that it warrants a permanent forfeiture of those rights and benefits. "The

---

[2] "The fundamental purpose of the Workers' Compensation Act . . . [is] compensation for accidental injuries within the hazards of the employment." <u>Morris v. Morris</u>, 238 Va. 578, 584, 385 S.E.2d 858, 861 (1989). "[T]he remedial purpose of the Act entitles it to liberal construction." <u>Id.</u> at 584, 385 S.E.2d at 862.

> Commission . . . must be mindful of the purposes and goals of the"
> Act. <u>Burton</u>, 1 Va. App. at 111, 335 S.E.2d at 850.

(Footnote added.) Accordingly, "[i]n order to work a forfeiture, the 'wage loss [must be] properly attributable to [the employee's] wrongful act . . . for which the employee is responsible,'" <u>id.</u> at 129, 442 S.E.2d at 222 (quoting <u>Murphy</u>, 12 Va. App. at 640, 406 S.E.2d at 193), *and* not properly attributable to the employee's disability, <u>Timbrook</u>, 17 Va. App. at 598-99, 439 S.E.2d at 876.

For example, in <u>Timbrook</u>, we determined that an injured employee's discharge from selective employment for work-related misconduct did not bar her right to post-termination compensation benefits because, among other reasons, the employee "was discharged for a 'reason[] concerning [her] disability.'" <u>Id.</u> at 599, 439 S.E.2d at 876. In <u>Eppling</u>, "we held that the claimant's excessive absenteeism caused by a non-work-related [health problem] beyond the employee's control was not the type of wrongful act which, upon termination [from selective employment], justified a forfeiture of workers' compensation benefits." <u>Walter Reed Convalescent Center v. Reese</u>, 24 Va. App. 328, 336, 482 S.E.2d 92, 97-98 (1997) (citing <u>Eppling</u>, 18 Va. App. at 129-30, 442 S.E.2d at 222). Conversely, in <u>Richfood, Inc. v. Williams</u>, 20 Va. App. 404, 409, 457 S.E.2d 417, 419 (1995), we held that an injured employee who was discharged from selective employment for work-related misconduct was not entitled to further disability benefits because "the reason for [the employee's] termination was unrelated to his injury and was due solely to his misconduct." In <u>Reese</u>, we concluded that a partially disabled employee was not entitled to compensation for her post-termination wage loss because the employee's termination from selective employment for her "repeated negligent errors" at work was not caused by her compensable injury. 24 Va. App. at 338-39, 482 S.E.2d at 97-98. We further explained in <u>Reese</u>:

- 13 -

In this case, the evidence established as a matter of law that claimant's wrongful acts . . . and not her injury or disability, caused her wage loss. Thus, this loss was not employer's responsibility. The evidence established that claimant's termination was unrelated to her injury and was due solely to her misconduct. . . . In this case, credible evidence established that claimant's failure to properly perform her job was caused by her incompetence, not her injury. No *credible* evidence showed that claimant's mistakes were caused by her injury or its residual effects.

Id.

Accordingly, in order to prevail on his claim for post-termination workers' compensation benefits in this case, claimant had to prove by a preponderance of the evidence that his termination from selective employment was causally related to his October 2, 1999 compensable industrial accident "or its residual effects." Id.; Hungerford Mechanical Corp. v. Hobson, 11 Va. App. 675, 678, 401 S.E.2d 213, 215 (1991) (noting that a claimant has the burden of establishing by a preponderance of the evidence that he is entitled to compensation); see also Leonard v. Arnold, 218 Va. 210, 214, 237 S.E.2d 97, 100 (1977) ("When a primary injury under the Work[ers]'s Compensation Act is shown to have arisen out of the course of employment, every natural consequence that flows from the injury is compensable if it is a direct and natural result of [the] primary injury."); Chesterfield County v. Dunn, 9 Va. App. 475, 477, 389 S.E.2d 180, 182 (1990) ("To be compensable as an injury by accident, a purely psychological injury must be causally related to a physical injury or causally related to an obvious sudden shock or fright arising in the course of employment."). Otherwise, employer was not responsible for that wage loss. Reese, 24 Va. App. at 338, 482 S.E.2d at 97.

The commission concluded that claimant's discharge was due to his misconduct in feigning the robbery, for which he was responsible, and was not attributable to his October 2, 1999 industrial accident. In reaching that decision, the commission wholly rejected Dr. Harris's opinion that "the feigned robbery . . . resulted directly from [claimant's] accident-related

- 14 -

psychiatric condition."  Relying instead on Dr. Harris's treatment notes and claimant's

testimony, the commission found that claimant's fabrication of the robbery was brought on by

his "anger at his employer, and frustration over his financial status and his ongoing situation

relative to perceived problems with accommodations and other employment issues not directly

related to the initial trauma."  Such problems, the commission found, were "of a nature more

akin to stress resulting from an employee's interaction with his supervisors, which is not

compensable," under Teasley, 14 Va. App. 45, 415 S.E.2d 596.  The commission added that

claimant had "pre-existing problems with anger or 'rage.'"

The commission's determination whether a claimant's post-termination wage loss is

causally related to his compensable injury by accident is a finding of fact.  See Reese, 24

Va. App. at 335, 337, 482 S.E.2d at 96-97; Ingersoll-Rand Co. v. Musick, 7 Va. App. 684, 688,

376 S.E.2d 814, 817 (1989) (noting that a "determination of causation is a factual finding").

Likewise, the commission's resolution of "conflicting expert opinions," including "an internal

conflict in an expert's opinion," is within the purview of the commission's fact-finding authority.

Chandler v. Schmidt Baking Co., 228 Va. 265, 268, 321 S.E.2d 296, 297 (1984).  "Although the

findings of the . . . Commission, if based on credible evidence, are conclusive and binding upon

us, the Commission's findings of fact are not binding upon us when there is no credible evidence

to support them.  The question of sufficiency of the evidence then becomes one of law."  Morris

v. Badger Powhatan/Figgie Int'l, Inc., 3 Va. App. 276, 279, 348 S.E.2d 876, 877 (1986).  "In

determining whether credible evidence exists, the appellate court does not retry the facts,

reweigh the preponderance of the evidence, or make its own determination of the credibility of

the witnesses."  Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991).

Moreover,

> [t]he commission may not arbitrarily disregard uncontradicted
> evidence of unimpeached witnesses, which is not inherently

- 15 -

incredible and not inconsistent with other facts in the record. Whether credible evidence exists to support a factual finding is a question of law which is properly reviewable on appeal. Causation is a factual determination to be made by the commission, but the standards required to prove causation and whether the evidence is sufficient to meet those standards are legal issues which we must determine. In considering whether credible evidence exists to support the necessary factual findings, we view the evidence in the light most favorable to the party prevailing below.

Hercules v. Gunther, 13 Va. App. 357, 361, 412 S.E.2d 185, 187 (1999) (citations omitted).

"A finding of causation need not be based exclusively on medical evidence. 'The testimony of a claimant may also be considered in determining causation, especially where the medical testimony is inconclusive.'" Lee County Sch. Bd. v. Miller, 38 Va. App. 253, 260, 563 S.E.2d 374, 377-78 (2002) (quoting Dollar Gen'l Store v. Cridlin, 22 Va. App. 171, 176, 468 S.E.2d 152, 154 (1996)). Furthermore, while "[m]edical evidence is not necessarily conclusive, but . . . subject to the commission's consideration and weighing," Hobson, 11 Va. App. at 677, 401 S.E.2d at 215, "'[i]n matters . . . which are not of common knowledge we must accept the opinion of experts. There is no other way in which an intelligent conclusion can be reached . . . .'" Walrod v. Matthews, 210 Va. 382, 389, 171 S.E.2d 180, 185 (1969) (quoting Lawson v. Darter, 157 Va. 284, 293, 160 S.E. 74, 77 (1931)); see also Seneca Falls Greenhouse & Nursery v. Layton, 9 Va. App. 482, 487, 389 S.E.2d 184, 187 (1990) (noting that, in matters that "are not common knowledge, the court must accept the opinion of experts"). We are further guided by the long-standing principle that,

> when an attending [medical expert] is positive in his diagnosis of a disease, great weight will be given by the courts to his opinion. However, when it appears . . . that the diagnosis is shaded by doubt, and there is medical expert opinion contrary to the opinion of the attending [medical expert], then the trier of the fact is left free to adopt that view which is most consistent with reason and justice.

Bristol Builders Supply Co. v. McReynolds, 157 Va. 468, 471, 162 S.E. 8, 9 (1932).

- 16 -

Applying these principles to the instant case, we conclude that, as a matter of law, there is no credible evidence in the record to support the commission's finding that claimant was discharged from selective employment for reasons unrelated to his compensable work-related accident. To the contrary, we find that all of the relevant credible evidence in the record plainly supports the conclusion that claimant's action in fabricating the robbery was directly related to his October 2, 1999 work-related accident.

On October 2, 1999, claimant was involved in a traffic accident in which he unavoidably struck and killed a pedestrian with his delivery truck while working for employer. Because of that accident, claimant suffered from numerous emotional problems, including flashbacks of the accident, fear of driving and crossing the street, anxiety attacks, feelings of being a killer, trouble sleeping and getting out of bed, and problems maintaining an erection. Dr. Harris, a clinical psychologist who first treated claimant ten days after the accident and continued treating him several times a month thereafter through at least July 2000, noted at intake that, having suffered the accident, claimant was a "nervous, tense/anxious, depressed, agitated, phobic male who was fully oriented with sad, hopeless, and depressed affect, and depressed/irritable mood," and who "was having trouble containing paranoid, hostile, and violent urges secondary to his anxious, agitated feelings." Dr. Harris specifically diagnosed claimant as suffering from posttraumatic stress disorder and "Adjustment Disorder with Mixed Anxiety and Depressed Mood" directly caused by the October 2, 1999 industrial accident. Dr. Harris was positive in his diagnosis and no evidence from any other mental health expert was provided to contradict that diagnosis. Employer accepted claimant's psychological injury as compensable and voluntarily authorized and paid for treatment of that condition, "up until a certain point."

At no point between October 12, 1999, and June 29, 2000, did Dr. Harris release claimant to full employment or otherwise indicate that claimant had recovered from his accident-related

- 17 -

psychological injury, as employer claims. To the contrary, as Dr. Harris noted, although claimant was able to achieve "brief periods of higher level driving function" at times, he continued to "need to temporarily self-modify his own driving exposure" when the symptoms of his disorder affected his ability to drive safely. Indeed, the commission noted that claimant was still on selective employment at the time of the feigned robbery. Moreover, Dr. Harris's contemporaneous treatment notes indicate that claimant's underlying mental disorder continued throughout that period and adversely affected his ability to problem solve, control negative thoughts, and manage stress and anger during that entire time.

As late as March 3, 2000, Dr. Harris wrote that, having started driving a new route on his own, claimant was thinking "more about violence" and had concerns about his ability to control his anger. Dr. Harris further noted that claimant would need a rider to assist him on the route. On April 7, 2000, Dr. Harris indicated in his notes that claimant was having flashbacks of a "man running in front of [his] truck." On April 27, 2000, Dr. Harris wrote that claimant was feeling "rage" and was going to terminate his medication. On May 4, 2000, Dr. Harris noted claimant was upset because employer had assigned him to drive the route where the fatal accident had occurred on October 2, 1999, and insisted that he do so even though claimant explained to employer that he was "having trouble sleeping," was "having flashbacks," and was off his prescription medication at that point. Dr. Harris further noted that claimant was feeling "pushed, trapped like [a] cornered animal [and] rage." That same day, Dr. Harris sent a letter to employer, stating that claimant was "greatly stressed and somewhat regressed, secondary to being scheduled to service the route where his accident occurred on October 2, 1999." Dr. Harris further stated in his letter that claimant was "clinically not ready to service that particular route at this time. He has made much progress in his therapy and his rehabilitation is progressing well.

It is however important that we continue to work closely together towards supporting his full recovery."

Dr. Harris's records from June 7, 2000, indicate that claimant was experiencing symptoms, including homicidal feelings. On June 14, 2000, Dr. Harris noted that claimant was told by employer that he could not get any more riders to assist him on his routes. Dr. Harris further noted that he would call or write employer regarding claimant's "need for a rider from time to time" and that he recommended claimant continue with his medication.

On July 18, 2000, less than three weeks after claimant's fabrication of the robbery, Dr. Harris opined that claimant's involvement in the June 29, 2000 incident was "related to" claimant's diagnosis of posttraumatic stress disorder. Dr. Harris further opined on September 24, 2002, that, as a result of the October 2, 1999 accident, claimant suffered from chronic posttraumatic stress disorder. Dr. Harris also opined on September 24, 2002, that "the feigned robbery of 06/29/00 resulted directly from [claimant's] accident-related psychiatric condition. [Claimant] was still actively traumatized by his 10/02/99 fatality, on 06/29/00. He was also frustrated, angry, fearful and problem-solving very poorly at that time. He was sleep deprived [with] suicidal ideation as well." Again, Dr. Harris was positive in his diagnosis and opinion, and no other mental health professional's opinion was offered to refute them.

We find nothing in the record, particularly in Dr. Harris's treatment notes and claimant's testimony, that is inconsistent with Dr. Harris's diagnosis and opinion. Despite rejecting Dr. Harris's opinion, the commission identified no such specific inconsistency in the record. Clearly, claimant never testified that his feigning of the robbery was unrelated to his October 2, 1999 accident. Nor does anything in Dr. Harris's extensive records suggest that the two incidents were not causally related. Indeed, Dr. Harris's notations and claimant's testimony regarding claimant's "anger at his employer, and frustration over his financial status and his

- 19 -

ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma" are entirely consistent with some of the symptoms documented by Dr. Harris that claimant experienced in connection with his accident-related mental disorder: his inability to problem solve, control negative thoughts, and manage stress and anger. As such, Dr. Harris's notations and claimant's testimony comport with Dr. Harris's opinion that claimant's involvement in the June 29, 2000 incident was causally related to his accident-related psychological disorder. Dr. Harris's unequivocal expert opinion may not, therefore, be disregarded by the commission as "inherently incredible" or "inconsistent with other facts in the record." Hercules, 13 Va. App. at 361, 412 S.E.2d at 187. Accordingly, the commission could not properly rely solely on isolated portions of Dr. Harris's notes and claimant's testimony that were not inconsistent with Dr. Harris's expert opinion to arbitrarily discount that opinion and to conclude on its own that "claimant's main problems were not directly related to his accident." To do so on this record, despite the egregious nature of claimant's conduct in feigning the robbery, undermines the purpose of the Workers' Compensation Act.

Likewise, the commission's reliance on our decision in Teasley, 14 Va. App. 45, 415 S.E.2d 596, to resolve the issue presented in this case is misplaced.

> In Teasley, the employee, *following an ongoing series of disagreements*, had a confrontation with his supervisor over his work assignments. He broke down emotionally and was diagnosed with [posttraumatic stress disorder due to the workplace confrontation]. He sought benefits, contending that his [posttraumatic stress disorder] was an occupational disease. The commission . . . denied the employee's claim because he failed to prove entitlement to compensation under Code § 65.1-46.1 (now Code § 65.2-401).

Mottram v. Fairfax County Fire & Rescue Dep't, 35 Va. App. 85, 94, 542 S.E.2d 811, 814-15 (2001) (emphasis added) (citing Teasley, 14 Va. App. at 49-50, 415 S.E.2d at 598-99), aff'd in

- 20 -

part and rev'd in part, 263 Va. 365, 375, 559 S.E.2d 698, 703 (2002). Holding that "purely psychological disability" resulting from "disagreements over managerial decisions and conflicts with supervisory personnel that cause stressful consequences . . . ordinarily are not compensable," we affirmed that decision. Teasley, 14 Va. App. at 49, 415 S.E.2d at 598.

Here, unlike in Teasley, it is undisputed that claimant's posttraumatic stress disorder arose from his October 2, 1999 work-related accident when he unavoidably killed a pedestrian, and not because of any disagreements or conflicts with employer. Claimant's problems with employer subsequently arose and grew progressively worse as a result of his psychological disorder, not vice versa. Indeed, claimant's testimony that none of the problems with employer that led to his feigning the robbery existed before the accident was uncontradicted. Hence, Teasley is inapplicable here.

Furthermore, the commission's vague reliance on the fact that claimant had a prior problem with rage as a dispositive factor in this case is also misplaced. While claimant indicated in his intake questionnaire with Dr. Harris that he had received prior psychological treatment for "rage" in 1996, no evidence was presented showing the precise nature or severity of that problem or the treatment therefor. Moreover, no evidence was presented to show that such a condition persisted three years later in 1999 or was related in any way to claimant's posttraumatic stress disorder arising from the October 2, 1999 industrial accident. To the contrary, claimant testified that he had not previously suffered any symptoms similar to those he suffered as a result of the fatal accident. Claimant's testimony was uncontradicted. Clearly, Dr. Harris was aware of that notation by claimant in the questionnaire when he opined that claimant's conduct on June 29, 2000, was directly related to the October 2, 1999 accident. Dr. Harris drew no causal connection, in his treatment notes or elsewhere, between the prior condition noted by claimant

- 21 -

and claimant's psychiatric disorder resulting from the accident. Nor, as previously noted, did any other health care professional do so in the record before us.

Even were we to assume that claimant's prior treatment for rage was relevant to the issue before us, "[i]t is well established that the employer takes the employee as the employer finds the employee, even where the employee suffers some [pre-existing] infirmity." Williams Indus., Inc. v. Wagoner, 24 Va. App. 181, 187-88, 480 S.E.2d 788, 791 (1997). "A finding that a pre-existing condition 'was accelerated or aggravated' by an injury sustained in an industrial accident establishes a causal connection between the injury and disability[,] and the 'disability resulting therefrom is compensable under the Workers' Compensation Act.'" Southern Iron Works, Inc. v. Wallace, 16 Va. App. 131, 134, 428 S.E.2d 32, 34 (1993) (quoting Olsten of Richmond v. Leftwich, 230 Va. 317, 320, 336 S.E.2d 893, 895 (1985)). Plainly, if claimant had a pre-existing psychological condition, the evidence in this case is sufficient to show that the psychological impact of claimant's traumatic October 2, 1999 accident was severe enough to have "accelerated or aggravated" that condition. Therefore, the mere, undeveloped fact that claimant received treatment for a prior psychological condition in 1996 is not persuasive evidence to show that claimant's discharge from selective employment was not properly attributable to the psychiatric disability he suffered as a direct result of his October 2, 1999 compensable accident.

Thus, based on the record in this case, we hold, as a matter of law, that no credible evidence supports the commission's finding of fact that claimant's post-termination wage loss was causally related solely to his misconduct on June 29, 2000, and not to his October 2, 1999 compensable injury by accident, such that claimant forfeited his right to workers' compensation benefits after June 29, 2000. We further hold that claimant met his burden of proving his entitlement to disability compensation for his post-termination wage loss. Dr. Harris's

unequivocal expert opinion was that claimant suffered from posttraumatic stress disorder resulting from his October 2, 1999 compensable accident and that claimant's actions on June 29, 2000, resulted directly from that disorder. No other evidence contradicts Dr. Harris's opinion, and we find no internal conflict in it. This evidence supports the conclusion that claimant's termination from selective duty employment was causally related to his compensable disability. Thus, consistent with the purpose of the Workers' Compensation Act, employer is responsible for claimant's resulting post-termination wage loss. See Reese, 24 Va. App. at 338, 482 S.E.2d at 97.

For these reasons, we conclude that the commission erred in denying claimant's claim for post-termination temporary partial disability benefits. Accordingly, we will reverse the commission's decision, enter judgment in favor of claimant, and remand this case to the commission for the purpose of calculating the amount of claimant's post-termination workers' compensation benefits.

Reversed and remanded.

Humphreys, J., dissenting.

Although the record in this case strongly suggests that the employer here failed to treat Artis with an appropriate level of regard,[3] I would affirm the commission's decision that "the totality of the evidence shows that the claimant was responsible for his wrongful actions on June 29, 2000." In my opinion, the record clearly supports the commission's implicit determination that the employer did not terminate Artis because of his injury or its "residual effects," as found by the majority. Instead, the record demonstrates that the employer terminated Artis because of his volitional, criminal acts – acts, which Artis himself testified would have culminated in homicide, had the circumstances occurred according to Artis's criminal plan. Thus, I believe the commission's denial of Artis's request for post-termination temporary partial disability benefits was supported both in law and fact.

As the majority notes,

> [w]ell established principles of workers' compensation law [must] guide our decision in this case. First, "[t]he purpose of the Workers' Compensation Act is to provide compensation to an employee for the loss of his opportunity to engage in work, when his disability is occasioned by an injury suffered from an accident arising out of and in the course of his employment. The Act should be liberally construed in harmony with its humane purpose." Barnett v. D.L. Bromwell, Inc., 6 Va. App. 30, 33-34, 366 S.E.2d 271, 272 (1988) (en banc) (citations omitted).

Potomac Edison Co. v. Cash, 18 Va. App. 629, 631-32, 446 S.E.2d 155, 156 (1994). "Under the Act, an employee who is properly terminated from selective employment procured by the employer for cause consisting of willful misconduct forfeits his or her entitlement to future temporary partial disability benefits." Id. In such circumstances, we have been "unable to find any provision within the Workers' Compensation Act which evidences an intent by the

---

[3] I find it particularly troubling that the employer forced Artis to complete his route immediately after this tragic accident occurred.

- 24 -

legislature to place such an employee in a better position than an uninjured employee who is terminated for cause and by his wrongful act suffers a loss of income." C & P Telephone v. Murphy, 12 Va. App. 633, 640, 406 S.E.2d 190, 193, aff'd en banc, 13 Va. App. 304, 411 S.E.2d 444 (1991).

Thus, in determining whether to impose a forfeiture, the commission must "consider the nature of [the] conduct," which is alleged to constitute the cause or to justify the dismissal. Eppling v. Schultz Dining Programs, 18 Va. App. 125, 129, 442 S.E.2d 219, 221 (1994). In conducting this analysis, the commission must be mindful that not every "type of willful conduct or misbehavior [rises to the level] that, upon termination, justifies a forfeiture of workers' compensation benefits [under Murphy]." Id. at 130, 442 S.E.2d at 222. Although we have yet to specify the type of conduct falling within this category, we have held that "in order to work a forfeiture, the 'wage loss [must be] properly attributable to [the employee's] wrongful act . . . *[for which t]he employee is responsible*." Id. (quoting Murphy, 12 Va. App. at 639-40, 406 S.E.2d at 193) (emphasis added). Accordingly, as noted by the majority, because "[t]he purpose of the [Act] is to compensate employees when they lose an opportunity to engage in work after suffering work-related injuries," Arlington County Fire Dep't v. Stebbins, 21 Va. App. 570, 572, 466 S.E.2d 124, 125-26 (1996), a factual analysis of each individual case must prove that the termination at issue was not "attributable to the employee's [injury]."

Simply put, we liberally construe the Act so as to protect those employees who are no longer able to work because of a work-related accident, even in the face of some types of misconduct - particularly conduct for which the employee cannot be held responsible. That is not the case here.

In finding that Artis's termination was "attributable" to his injury, the majority relies upon Artis's psychologist's opinion that Artis's conduct was caused by his PTSD.[4] Assuming without deciding that despite its decision to terminate benefits, the commission necessarily accepted this opinion as true, I believe the majority gives short shrift to the crucial fact that no evidence established this "causal relationship" affected Artis to such an extent that his actions were "beyond [his] control." Walter Reed Convalescent Center v. Reese, 24 Va. App. 328, 338-39, 482 S.E.2d 92, 97-98 (1997). Indeed, the case at bar is inapposite to Timbrook v. O'Sullivan Corp., 17 Va. App. 594, 439 S.E.2d 873 (1994), and Eppling. In Timbrook,

> [we] held that the Murphy forfeiture rule does not apply to an employee who was discharged for failing to notify her employer that she would be absent *from selective employment that she had refused*. Because the employee had refused, or not accepted, the employer's offer of selective employment, her termination following three consecutive absences was "not for cause or for misconduct, as in Murphy, [which would] justify a forfeiture of her compensation benefits that could never be cured." [Timbrook, 17 Va. App. at 598, 439 S.E.2d at 876].

Eppling, 18 Va. App. at 129-30, 442 S.E.2d at 222 (discussing Timbrook, 17 Va. App. at 598, 439 S.E.2d at 876) (emphasis added). In Eppling, "we held that the claimant's excessive absenteeism caused by a non-work-related injury *beyond the employee's control* was not the type of wrongful act which, upon termination, justified a forfeiture of workers' compensation benefits." Reese, 24 Va. App. at 338, 482 S.E.2d at 98 (discussing Eppling, 18 Va. App. at 129-30, 422 S.E.2d at 222) (emphasis added).

---

[4] I must conclude from the majority's rather sparse analysis that it has either invaded the province of the commission as fact finder to reach the conclusion that Artis's criminal actions were non-volitional, or the majority is implicitly holding today that misconduct of any kind, obviously including criminal activity up to the level of a homicide, does not justify a termination of benefits if there is *any* nexus between the misconduct and the injury irrespective of any public policy considerations the General Assembly may have had in mind in placing limitations on the continuation of benefits. Although I am unsure which is the case, I cannot embrace either scenario.

- 26 -

Here, Artis's conduct was not related to a refusal of selective employment, nor was it in any way related to the procedural aspects of his claim for workers' compensation benefits. Moreover, there is no evidence in the record suggesting that Artis could not perform the duties of his selective employment for reasons, related to his injury, that were beyond his control. In fact, the evidence demonstrates that Artis was fully capable of performing his duties and that he did so. Thus, there is simply no evidence that Artis was terminated because of his work-related injury or its residual effects.

Instead, the record supports the commission's conclusion that Artis was terminated as a direct result of his volitional, criminal acts. Specifically, because Artis was frustrated and angry toward his supervisor, as well as other aspects of his personal life, he staged a robbery, misappropriating $200 of the employer's funds, with the intent of murdering his supervisor once he arrived at the scene. Even were we to give more weight to Artis's psychologist's opinion than that given to it by the commission, the evidence still falls short of establishing that Artis's "causally related" actions were beyond his control. To the contrary, Artis himself testified that he acted with premeditation, and with knowledge of his actions and the consequences thereof.

Accordingly, I would find that the commission correctly determined Artis was terminated, not for reasons related to his injury or its residual effects, but for misconduct for which he was fully "responsible." In fact, to carry the majority's analysis to its logical conclusion, what we hold today is that if Artis had been successful, and murdered his supervisor, the employer would still be required to provide him with the benefits at issue because such conduct would be, at least in part, causally related to his PTSD and therefore, not the type of misconduct or misbehavior envisioned by our decision in Murphy.

Because I believe that Artis's volitional conduct amounted to precisely the type of "wrongful act" that would "justif[y]" a forfeiture of compensation benefits, I simply cannot agree

with such a conclusion. <u>Murphy</u>, 12 Va. App. at 639, 406 S.E.2d at 193. I would thus affirm the decision of the commission. <u>See</u> <u>Marval Poultry Co. v. Johnson</u>, 224 Va. 597, 598, 299 S.E.2d 343, 344 (1983) (holding that a disabled employee on selective work status was no longer entitled to workers' compensation benefits when "he [was] discharged by his employer for dishonesty"); <u>Goodyear Tire & Rubber Co. v. Watson</u>, 219 Va. 830, 833, 252 S.E.2d 310, 313 (1979) (holding that a partially disabled employee's rights to compensation benefits were properly terminated when the employee was discharged because he had been "an exceedingly poor worker during the entire period of his employment . . . he had a great number of absences from work, and . . . several times he left his job without authorization"); <u>Richfood, Inc. v. Williams</u>, 20 Va. App. 404, 410, 457 S.E.2d 417, 420 (1995) ("Where passing drug and alcohol screening is made a clear and unequivocal condition of employment, . . . failure to pass the screening is tantamount to misconduct . . . for which an employee can be terminated."); <u>Murphy</u>, 12 Va. App. at 639, 406 S.E.2d at 193 (holding that an employee's conduct constituted "cause" for discharge, justifying a forfeiture of benefits, where he was guilty of fraudulent misrepresentations in his attempt to obtain compensation benefits).